Filed:  February 24, 1998

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 95-4017
(CA-93-2361-3-6BD)

Ronnie Howard,

Petitioner - Appellant,

versus

Michael W. Moore, etc., et al,

Respondents - Appellees.

O R D E R

The Court amends its opinion filed December 9, 1997, as follows:

On page 2, first paragraph of opinion, line 9 -- the reference to § 106 is corrected to read "§ 10<u>4</u>."

For the Court - By Direction

/s/ Patricia S. Connor

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RONNIE HOWARD,
Petitioner-Appellant,

v.

MICHAEL W. MOORE, Director of

No. 95-4017

South Carolina Department of
Corrections; CHARLES M. CONDON,
Attorney General of the State of
South Carolina,
Respondents-Appellees.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Charles E. Simons, Jr., Senior District Judge.
(CA-93-2361-3-6BD)

Argued: April 8, 1997

Decided: December 9, 1997

Before WILKINSON, Chief Judge, RUSSELL, WIDENER, HALL,
MURNAGHAN, WILKINS, NIEMEYER, HAMILTON, LUTTIG,
WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Williams wrote the majority
opinion, in which Chief Judge Wilkinson and Judges Russell, Wid-
ener, Wilkins, Niemeyer, Hamilton, and Luttig joined. Judge Michael
wrote a dissenting opinion, in which Judges Hall, Murnaghan, and
Motz joined.

_____

**COUNSEL**

**ARGUED:** Sheri Lynn Johnson, CORNELL LAW SCHOOL, Ithaca, New York, for Appellant. Donald John Zelenka, Assistant Deputy Attorney General, Columbia, South Carolina, for Appellees. **ON BRIEF:** H.W. Pat Paschal, Jr., Greenville, South Carolina; Barney O. Smith, Jr., Greenville, South Carolina, for Appellant. Charles Molony Condon, Attorney General, John W. McIntosh, Deputy Attorney General, W. Edgar Salter, III, Senior Assistant Attorney General, Lauri J. Soles, Assistant Attorney General, Columbia, South Carolina, for Appellees.

---

**OPINION**

WILLIAMS, Circuit Judge:

In June 1986, Ronnie Howard was convicted of capital murder by a South Carolina jury and sentenced to death. After exhausting his state appeals, he petitioned the federal district court for habeas corpus relief. The district court denied his petition and Howard appeals, raising numerous constitutional challenges to the state court proceedings. After oral argument before a panel of this Court, we voted to hear Howard's appeal en banc to address the important procedural and substantive issues raised. These issues included whether the more deferential habeas standards of review set forth in § 104 of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), signed into law on April 24, 1996, and codified at 28 U.S.C.A. § 2254(d) (West Supp. 1997), apply to this appeal; whether the prosecutor's peremptory challenges violated Batson v. Kentucky, 476 U.S. 79 (1986); whether questioning by Howard's federal probation officer after Howard's invocation of his Fifth Amendment right to counsel tainted his subsequent confessions; and whether the admission of Howard's redacted confessions erroneously excluded exculpatory and mitigating evidence from the jury's consideration.

The en banc court heard oral argument on April 8, 1997. On June 23, 1997, the United States Supreme Court issued its opinion in Lindh v. Murphy, 117 S. Ct. 2059 (1997), in which it held that the new

2

habeas standards of review, codified at 28 U.S.C.A. § 2254(d) (West Supp. 1997), do not apply to habeas corpus petitions pending in federal court prior to the enactment of the AEDPA. Howard filed his habeas petition in the district court prior to April 26, 1996, the effective date of the AEDPA. We, therefore, review Howard's claims under pre-AEDPA law.**1**

Applying the proper standard of review to the substantive issues on appeal, we conclude that (1) no Batson violation occurred; (2) Howard's oral confessions to FBI Special Agent Brendan Battle and Lieutenant William Hitchins of the Greenville County Sheriff's Department were not "tainted fruits" of an improper custodial interrogation by Howard's federal probation officer, Haywood Polk; (3) the redactions of his confessions were not violative of his Fifth and Eighth Amendment rights; and (4) the other assignments of error raised by Howard have no merit. Accordingly, we affirm the district court's denial of habeas relief.

I.

The primary facts of the tragedy underlying this appeal are undisputed. Chinh Le disappeared on her way home from work in Greenville, South Carolina, on the evening of August 29, 1985. On September 12, 1985, Howard was arrested on unrelated robbery charges in Asheville, North Carolina, and detained in the Buncombe County Jail. After Howard was appointed counsel and invoked his

_____

**1** Although the State contends that it became eligible for the procedures outlined in § 107 of the AEDPA as of June 18, 1996, with the enactment of the Effective Death Penalty Act of 1996, 1996 S.C. Acts 448, we need not decide whether those procedures satisfy the statutory opt-in requirements of § 107 because, whatever the merits of South Carolina's appointment system, § 107 is inapplicable to this appeal since Howard's state habeas petition was finally denied by the South Carolina Supreme Court before June 18, 1996. See Bennett v. Angelone, 92 F.3d 1336, 1342 (4th Cir.) (concluding that Virginia was ineligible for the benefits of § 107 of the AEDPA, regardless of the merits of Virginia's current appointment of counsel procedures, because petitioner's Virginia habeas petition had been finally denied by the Virginia Supreme Court prior to the passage of Virginia's appointment of counsel procedures), cert. denied, 117 S. Ct. 503 (1996).

Fifth Amendment right to remain silent, Howard met with his federal probation officer, Haywood Polk, on October 3. During this meeting, Howard orally confessed to his involvement in numerous armed robberies and in two murders, including the murder of Le. At this meeting, Howard also asked to speak to the FBI about his crimes in the hopes of negotiating a plea to lessen his punishment. As a result, Howard met with Agent Battle on October 8, and, after signing a waiver of rights form, orally confessed to, among other things, Le's murder.[2] Agent Battle immediately notified Lieutenant Hitchins of the Greenville County Sheriff's Department of Howard's connection to the Greenville murder. Lieutenant Hitchins contacted Howard and the two met on October 16 at which time Howard, after orally waiving his rights under Miranda v. Arizona, 384 U.S. 436 (1966), again orally confessed to Le's murder.

In each confession, Howard revealed that he and Rickey Weldon had formulated a plan to steal the automobile of a lone female driver. On August 29, the two men spotted Le and followed her down a dirt road where they "bumped" the rear of her vehicle. When Le exited her automobile to inspect the damage, Howard forced her back into her automobile at gunpoint. Howard then drove away in Le's vehicle, and Weldon followed in the other car. Howard subsequently stopped in an isolated area where the two men beat Le and eventually murdered her by placing a piece of plastic over her head until she suffocated to death. They again drove around until they found another isolated area where they dumped Le's body into a clump of kudzu vines.[3] Before

_____

[2] In addition to the murder of Le, Howard confessed to Polk and later to Agent Battle that he had murdered Mary Duncan in Oconee County, South Carolina. During the Duncan trial, Howard's confession to Agent Battle was admitted into evidence over Howard's objections. On direct appeal, Howard challenged the admissibility of the confession to Agent Battle on numerous grounds, including an argument that the confession was the "tainted fruit" of a custodial interrogation conducted by Polk in violation of Miranda. The South Carolina Supreme Court affirmed Howard's conviction and life sentence, concluding that Polk's questioning of Howard did not constitute a "custodial interrogation" triggering the safeguards of Miranda. See State v. Howard, 374 S.E.2d 284, 287-88 (S.C. 1988). This issue was not raised by Howard in the direct appeal of the murder of Le.

[3] Kudzu is a green leafy vine of Japanese origin found in the southeastern part of the United States. It is used primarily for forage and erosion control. In August, kudzu provides a thick vegetative cover over many fields and wooded areas in South Carolina.

4

disposing of her body, however, Howard and Weldon removed all her clothing and washed her body, first with soda and then in a mud puddle, to remove any fingerprints. Howard and Weldon then abandoned Le's automobile in Columbia, South Carolina. Howard, however, retained possession of some of Le's personal belongings and traveled to Charlotte, North Carolina, where he disposed of the items in various garbage dumpsters. As a result of Howard's confession, South Carolina authorities recovered Le's body and her automobile several weeks after her death.

Howard and Weldon were tried jointly for Le's murder. The State introduced Howard's confessions into evidence through the testimony of Agent Battle and Lieutenant Hitchins, both of whom had taken meticulous handwritten notes of their conversations with Howard. Polk did not testify. In compliance with Bruton v. United States, 391 U.S. 123 (1968), the trial court directed Agent Battle and Lieutenant Hitchins not to reveal those portions of Howard's confessions inculpating his codefendant Weldon during direct or cross examination. On June 5, 1986, a jury found both defendants guilty of murder, kidnapping, armed robbery, and conspiracy. Howard and Weldon were each sentenced to death for the murder, plus twenty-five years for the armed robbery and five years for the conspiracy.

On direct appeal, the South Carolina Supreme Court upheld Howard's conviction and his death sentence. See State v. Howard, 369 S.E.2d 132 (S.C. 1988), cert. denied, 490 U.S. 1113 (1989).**4** The state

_____

**4** On direct appeal, Howard challenged his conviction, claiming that the trial court erroneously (1) refused to quash the jury panel pursuant to Batson v. Kentucky, 476 U.S. 79 (1986); (2) refused to sever his trial from that of his codefendant Weldon; (3) admitted Weldon's confession in violation of Howard's right to confrontation; (4) submitted the case to the jury when the State failed to present any proof of the corpus deliciti aside from his confession; (5) admitted his confession when it was obtained in violation of his right to counsel under both the Fifth and Sixth Amendments; and (6) refused to provide Howard with two attorneys in compliance with S.C. Code Ann. § 16-3-26(b) (Supp. 1986). Howard alleged that in the penalty phase the trial court erroneously (1) refused to admit Howard's federal parole records as mitigating evidence; (2) admitted portions of Howard's statements in which he confessed to

5

court also affirmed Weldon's conviction, but reversed his death sentence and remanded for resentencing.**5** The United States Supreme Court denied Howard's petition for certiorari, see 490 U.S. 1113 (1989), and his petition for rehearing, see 492 U.S. 932 (1989). Howard then sought post-conviction relief (PCR) in state court.**6** After con-

_____

approximately 70 armed robberies and another murder; (3) admitted affidavits regarding Howard's participation in additional armed robberies; (4) refused to declare a mistrial following the prosecutor's comments concerning Howard's failure to testify; (5) admitted evidence regarding the victim's background; (6) conducted the trial past midnight; and (7) failed to admit Howard's complete confessions into evidence in mitigation of punishment.

**5** On direct appeal, the South Carolina Supreme Court concluded that Weldon was unduly prejudiced during the penalty phase of the trial by the exclusion of his complete confession. The trial court had redacted portions of Weldon's confession in compliance with Bruton v. United States, 391 U.S. 123, 133-34 & n.10 (1968) (the introduction of a jointly tried, non-testifying codefendant's statement violates the Sixth Amendment Confrontation Clause if the statement contains incriminating statements concerning a defendant). The State Supreme Court held that the unredacted version of Weldon's confession supported his position that he acted under Howard's domination, a statutory mitigating circumstance charged to the jury. Because the State Supreme Court determined that this information was erroneously excluded from the jury's consideration, it vacated Weldon's death sentence and remanded for resentencing. The State Supreme Court rejected Howard's argument that he was prejudiced by the exclusion of portions of his confessions, concluding that his unredacted confessions, unlike Weldon's, contained no mitigating evidence.

**6** In the state PCR court, Howard argued that (1) he received ineffective assistance of counsel; (2) the trial court erroneously failed to admit Howard's complete confessions; (3) the trial court erroneously failed to appoint experienced counsel; (4) the trial court erroneously admitted Howard's unconstitutionally obtained confessions; (5) the trial court erroneously failed to provide a meaningful psychiatric evaluation; (6) the trial court erroneously denied Howard funds for a jury expert; (7) his trial counsel had a conflict of interest; (8) the trial court erroneously admitted Howard's guilty plea to the unrelated robbery charge in North Carolina, because it was involuntary; (9) the prosecutor failed to disclose favorable mitigation evidence prior to trial in accordance with Brady v. Maryland, 373 U.S. 83 (1963); (10) the trial court erroneously excluded the testi-

ducting an evidentiary hearing, the state PCR court denied Howard relief on September 3, 1991. The South Carolina Supreme Court affirmed the denial of relief, and the United States Supreme Court again denied certiorari, see 508 U.S. 917 (1993).

On September 17, 1993, Howard filed this federal habeas action in the United States District Court for the District of South Carolina. The petition was referred to a magistrate judge, who recommended denying Howard's motion for an evidentiary hearing and his petition for habeas corpus relief. The district court adopted the findings of the magistrate judge and granted the State's motion for summary judgment on June 16, 1995. Howard now appeals the district court's denial of habeas corpus relief.

II.

Howard raises several issues in his petition to this Court. He argues that his conviction should be reversed because (1) the prosecutor improperly used peremptory strikes against six of the seven black potential jurors in violation of Batson v. Kentucky, 476 U.S. 79 (1986); (2) the trial court erroneously admitted portions of Howard's confessions made to Agent Battle and Lieutenant Hitchins; and (3) the trial court erroneously excluded from the jury's consideration portions of Howard's confessions which contained exculpatory evidence. Howard also challenges his death sentence on the grounds that (1) the trial court erroneously excluded mitigating evidence contained in Howard's confessions in violation of Lockett v. Ohio, 438 U.S. 586 (1978), and Skipper v. South Carolina, 476 U.S. 1 (1986); (2) the trial court erroneously failed to reinstruct the jury on the elements of

_____

mony of his federal probation officer, Haywood Polk; (11) the trial court erroneously instructed the jury so as to allow a finding of guilt below the degree of proof required; (12) there was improper ex parte contact between the prosecutor's office and the jury; (13) the trial court arbitrarily excluded women with children from the venire; (14) the trial court erroneously instructed the jury regarding aggravating and mitigating circumstances and failed to reinstruct the elements of lesser included offenses; and (15) the trial court erroneously admitted evidence regarding the victim's background.

7

involuntary manslaughter when it repeated its instructions on murder; (3) Howard's counsel was ineffective in failing to present certain mitigating evidence during the penalty phase of the trial; (4) the prosecutor improperly commented on Howard's failure to testify during closing arguments; and (5) there was improper ex parte contact between the prosecutor's office and the jury.

When considering a habeas petition, we review de novo the state court's determinations of questions of law, see Savino v. Murray, 82 F.3d 593, 598 (4th Cir.), cert. denied, 117 S. Ct. 1 (1996), and of mixed questions of law and fact, see Miller v. Fenton, 474 U.S. 104 (1985). However, the state court's factual findings underlying those determinations are presumed to be correct and binding, as long as they were made after a full, fair, and adequate hearing on the merits. See 28 U.S.C.A. § 2254(d) (West 1994) (pre-AEDPA); see also Sumner v. Mata, 449 U.S. 539, 546-47 (1981). The habeas petitioner bears the burden of establishing by convincing evidence that a state court's factual determinations were erroneous. See 28 U.S.C.A. § 2254(d) (pre-AEDPA); see also Sumner, 449 U.S. at 550. We now address each of Howard's claims in turn.

A.

First, Howard, who is black, argues that the prosecutor's use of peremptory strikes to exclude black venirepersons from the jury violated Batson v. Kentucky, 476 U.S. 79 (1986). We conclude, however, that Howard has failed to rebut by clear and convincing evidence the trial court's finding, affirmed by the South Carolina Supreme Court, that the challenges were not exercised for racially discriminatory reasons. See Hernandez v. New York, 500 U.S. 352, 364 (1991) (plurality opinion) (holding that the intent to discriminate under Batson is "a pure issue of fact, subject to review under a deferential standard"); see also id. at 369 (holding that the findings of the trial court on discriminatory intent in Batson challenge are reviewed for clear error); Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 534 (1979) (holding that the finding of intent to discriminate is a factual determination subject to the "clearly erroneous" standard of review); Jones v. Plaster, 57 F.3d 417, 421 (4th Cir. 1995) ("A finding by the [trial] court concerning whether a peremptory challenge was exercised for

8

a racially discriminatory reason is given great deference by this court; we review that finding only for clear error."). Accordingly, we affirm.

After voir dire, forty-two persons were qualified as jurors, only seven of whom were black. The prosecutor struck six of the seven black prospective jurors and four of the thirty-five white prospective jurors, resulting in a jury of eleven white jurors and one black juror. Howard moved to quash the panel pursuant to Batson. The trial court found, and we agree, that the prosecutor's striking of six out of the seven black prospective jurors constituted a prima facie case of discrimination.[7]

Once the defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to articulate race-neutral explanations for the challenges. See Batson, 476 U.S. at 97. The prosecutor's "explanation need not be `persuasive, or even plausible,' as long as it is neutral." Matthews v. Evatt, 105 F.3d 907, 917 (4th Cir.) (quoting Purkett v. Elem, 115 S. Ct. 1769, 1771 (1995)), cert. denied, 118 S. Ct. 102 (1997); see also Jones, 57 F.3d at 420 ("To satisfy this burden, the party need offer only a legitimate reason for exercising the strike, i.e., one that does not deny equal protection; the reason need not be worthy of belief or related to the issues to be tried or to the prospective juror's ability to provide acceptable jury service."). If the prosecutor satisfies this requirement, the burden shifts back to the defendant to prove that the explanation given is a pretext for discrimination. See Batson, 476 U.S. at 98. The ultimate burden always rests with the opponent of the challenge to prove "purposeful discrimination." See Hernandez, 500 U.S. at 360 ("`"Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part "because of," not merely "in spite

_____

[7] To establish a prima facie violation of racial discrimination in the use of peremptory challenges, a defendant must demonstrate that (1) "he is a member of a cognizable racial group"; (2) "that the prosecutor has exercised peremptory challenges to remove the venire members of the defendant's race"; and (3) "that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Batson v. Kentucky, 476 U.S. 79, 96 (1986).

9

of," its adverse effects upon an identifiable group."' (quoting Personnel Adm'r v. Feeney, 442 U.S. 256, 279 (1979) (internal footnote and citation omitted))); see also Jones, 57 F.3d at 420-21 ("[T]he party challenging the selection process [must] prove[ ] that intentional discrimination was a substantial or motivating factor in the decision to exercise the strike."). The trial court must then determine whether the challenge was exercised for a racially discriminatory reason. The trial court's resolution of this issue rests largely on credibility determinations, and therefore, we give its findings great deference. See Jones, 57 F.3d at 421 ("[T]he [trial] court is especially well-suited to resolve challenges to peremptory strikes of jurors because it has observed with its own eyes the very act in dispute.").

Howard first challenges the prosecutor's use of peremptory strikes against black prospective jurors Edward Wood and Charles Copeland. During the Batson hearing, the prosecutor explained that he struck Wood "because he said he leans towards life every time. He was more pro-life. He said he was not really for the death penalty." (J.A. at 536-37.)**8** The prosecutor further stated that Copeland was struck "because he said . . . from a religious standpoint he would find it hard to vote for the death penalty. He said he does not believe another man should take another man's life. He also said it would have to be [a] very extreme case for him to vote for the death penalty." (J.A. at 537.)

Although Howard admits that these reasons are race-neutral, he argues that they were pretextual because the prosecutor failed to strike white jurors expressing similar views. While this circumstance may give rise to an inference of pretext, see Ford v. Norris, 67 F.3d 162, 169 (8th Cir. 1995), "Batson is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not," Matthews, 105 F.3d at 918. Both the prosecutor and defense counsel must be allowed to make credibility determinations when exercising peremptory challenges. For example, counsel may consider "the `characteristics of the other prospective jurors against whom peremptory challenges might be exercised; to reevaluate the mix of jurors . . . and to take into account tone, demeanor, facial expression, emphasis -- all those factors that make the words uttered

_____

**8** "J.A." indicates a reference to the Joint Appendix. "App." indicates a reference to the State Supreme Court Appendix.

by the prospective juror convincing or not.'" Id. (quoting Burks v. Borg, 27 F.3d 1424, 1427 (9th Cir. 1994), cert. denied, 513 U.S. 1095 (1995)).

Moreover, the responses of the white jurors cited by Howard were sufficiently dissimilar to those provided by the black jurors to show that the prosecutor did not intentionally discriminate in the selection of the jury. Although white jurors Richard Ashmore, Sharon Lunny, and Floyd Rohm were ambivalent about the death penalty, Wood's and Copeland's anti-death penalty sentiments were much stronger. As a result, mindful of the deference we must give the trial court, we affirm its finding that the prosecutor's reasons for striking Wood and Copeland were not pretextual.

Howard also challenges the striking of Antonio Golden and Amanda Fuller, arguing that the combination of factors relied upon by the prosecutor to strike them was not supported by the record. The prosecutor explained that he struck Golden because she had an "er-ratic" work history, her husband was "unemployed," and he was attempting to reach the next juror whom he believed was a stronger advocate of the death penalty. The prosecutor stated that he chal-lenged Fuller due to her "unstable work history," her young age, and her inability to "commit generally for or generally against the death penalty." Employment status is a legitimate race-neutral factor that may be relied upon by a prosecutor for challenging a potential juror. See United States v. Day, 949 F.2d 973, 979 (8th Cir. 1991). Like-wise, age is an acceptable race-neutral factor. See United States v. Jackson, 983 F.2d 757, 762 (7th Cir. 1993). Again, we cannot say that the trial court erred in concluding that Howard failed to prove that the given reasons for striking these jurors were pretextual.

Finally, Howard argues that the prosecutor's comprehensive ques-tioning of Gladys McElrath and his mischaracterization of Jeffrey Dunbar's testimony demonstrate his discriminatory intent. We dis-agree. McElrath's statements that she did not believe in capital pun-ishment and "would go for life" legitimately prompted extensive questioning by the prosecutor, and the prosecutor's observation that Dunbar had twice stated he could not vote for the death penalty was accurate. Moreover, Dunbar's unique status as a recent high school graduate was a race-neutral reason for striking him. See Jackson, 983

11

F.2d at 762 (holding that age is an acceptable race-neutral reason for striking a prospective juror). In sum, we hold that the trial court did not err in concluding that the prosecutor's striking of the challenged black venirepersons was not racially motivated.

## B.

Next, Howard challenges the admission of his two confessions, which were admitted in redacted form in accordance with Bruton v. United States, 391 U.S. 123 (1968). First, he contends that the confessions should have been suppressed because they were the tainted fruits of a custodial interrogation initiated by his probation officer in violation of Edwards v. Arizona, 451 U.S. 477 (1981). Second, Howard argues that if the confessions were legally obtained, the failure to admit each confession in its entirety was erroneous because the exclusions distorted the meaning of the confessions, created a materially false impression of Howard's relative culpability, and excluded substantially exculpatory evidence. Third, he claims that the unredacted version of his confessions contained statements admissible as mitigating evidence in the penalty phase of the trial under Lockett v. Ohio, 438 U.S. 586 (1978).

## 1.

Howard argues that his confessions to FBI Agent Battle and Greenville County Lieutenant Hitchins should have been suppressed because they were the "tainted fruits" of a custodial interrogation initiated by his federal probation officer, Haywood Polk, in violation of Edwards v. Arizona, 451 U.S. 477 (1981). Whether Howard's confessions are "tainted fruits" is a question of law reviewed de novo. See United States v. Elie, 111 F.3d 1135, 1140 (4th Cir. 1997). After a thorough review of the record, we conclude that the confessions were properly admitted.

## a.

On September 12, 1985, two weeks after Le's disappearance, police in Asheville, North Carolina, arrested Howard on robbery charges. On September 18, Attorney Gary Cash was appointed to rep-

12

resent Howard on the North Carolina robbery charges. On October 2, Asheville Detective Lee Warren and two South Carolina detectives met with Howard and Cash to discuss a series of South Carolina robberies under investigation. Howard, following Cash's advice, declined to make any statement. Cash then attempted to negotiate an immunity agreement with South Carolina authorities in exchange for a statement from Howard. An agreement could not be reached, however, and Cash notified the North Carolina and South Carolina authorities that Howard would not make any statements.

On October 3, 1995, Howard met with Polk in Asheville, where Howard remained in custody. At that time, Howard confessed to numerous armed robberies and to two South Carolina murders, including the murder of Le. Hoping to obtain lesser sentences for his crimes, Howard asked Polk to arrange for him to speak to an FBI agent about the crimes. Polk contacted Agent Battle, who met with Howard on October 7 and October 8. Howard signed standard Miranda waiver of rights forms on both October 7 and October 8 prior to speaking with Agent Battle. In addition, on October 7, Howard signed an addendum to the waiver of rights form specifically acknowledging his desire to speak with the FBI without the benefit of counsel.[9] Having waived his right to counsel, on October 8 Howard confessed in great detail to the Le murder and approximately seventy other armed robberies.

Agent Battle immediately notified Lieutenant Hitchins of Howard's involvement in Le's murder. Lieutenant Hitchins met with Howard on October 16. Lieutenant Hitchins advised Howard of his Miranda rights and requested that he sign a waiver of rights form.

_____

[9] Before Howard gave his oral statement to Agent Battle, he signed a paragraph, handwritten by Agent Battle, which stated:

> I, Ronnie Howard, have requested through my federal probation officer, Mr. Haywood Polk, to be interviewed by the F.B.I. about my involvement in criminal activities. I do not want the lawyer present who is representing me on Asheville armed robbery charges and understand that the F.B.I. agents will ask me no questions about those charges. Signed Ronnie Howard.

(App. at 867.)

13

Howard stated that "he preferred not to" sign the form, and gave an oral statement to Lieutenant Hitchins confessing to the Le murder. During their meetings with Howard, both Agent Battle and Lieutenant Hitchins took notes that were later transcribed for their respective reports. After reviewing these reports, the trial court ordered both witnesses to refrain from discussing Weldon's part in Le's murder, except as it was corroborated in Weldon's own confession.

b.

The trial court conducted a hearing pursuant to Jackson v. Denno, 378 U.S. 368 (1964), prior to the admission of the statements during both the guilt and penalty phases of Howard's trial. After considering the testimony of Howard, Agent Battle, and Lieutenant Hitchins, the trial court denied Howard's motion to suppress the confessions. The trial court found that

> the State has proven beyond a reasonable doubt and met its burden that the Defendant was first advised of his constitutional rights, his Miranda rights, that he fully understood the warnings and knowingly elected to waive his rights, that he did indeed make a statement, and that the statement was freely and voluntarily made under the totality of the circumstances, and also that all constitutional Miranda rights were accorded him and complied with.

(J.A. at 551-52.) The South Carolina Supreme Court affirmed. During his state PCR hearing, Howard again argued that his confessions should have been suppressed because they were not voluntarily given and that they were the "tainted fruits" of a custodial interrogation by Polk made in violation of Miranda. The state PCR court rejected Howard's argument, finding that Howard's "statements were freely and voluntarily given and that none were taken in violation of [his] Miranda and Edwards rights." (J.A. at 839.) None of the state courts reviewing Howard's appeal have specifically found whether Polk or Howard initiated their meeting, or whether their meeting constituted a custodial interrogation.**10**

_____

**10** As previously discussed at n.2, supra, in Howard's direct appeal of his conviction for the murder of Mary Duncan, Howard claimed that his

14

The federal magistrate judge dismissed Howard's allegation that Polk was acting on behalf of the FBI when he interviewed Howard and that the interview constituted a custodial interrogation. The magistrate judge noted that Howard's allegations flatly contradicted his earlier position in state court that his counsel was ineffective for not calling Polk, Howard's friend as well as his probation officer, as a favorable witness for Howard during the trial. The district court similarly concluded that because "[n]othing in the record demonstrates that Polk was acting outside his role as probation officer in approaching petitioner," there was no "custodial interrogation" and therefore, no Edwards violation.**11** We review the district court's legal conclusions de novo. See Savino v. Murray, 82 F.3d 593, 598 (4th Cir. 1996).

c.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court outlined "concrete constitutional guidelines for law enforcement agencies and courts to follow." Id. at 442. For example, "Miranda . . .

_____

waiver of his right to counsel during his meeting with Polk was ineffective because Polk violated his Fifth Amendment right against self-incrimination when he questioned Howard at the Buncombe County Jail on October 3, 1985. The South Carolina Supreme Court rejected Howard's claim, concluding that Polk did not "interrogate" Howard during his visit to the jail. While Howard steadfastly challenged the admissibility of the confessions to Agent Battle and Lieutenant Hitchins throughout his trial for the murder of Le and on direct appeal on various grounds, he did not argue that the confessions were "tainted fruit" directly resulting from Polk's "custodial interrogation" until his state habeas proceeding. Therefore, Howard's Edwards claim is arguably procedurally defaulted by virtue of his failure to raise it on direct appeal. The State, however, has waived the procedural default issue by failing to argue it before this Court. See United States ex rel. Bonner v. DeRobertis, 798 F.2d 1062, 1066 (7th Cir. 1986).

**11** Although Howard argues that the district court implicitly found that Polk initiated the meeting with him, we conclude that neither the magistrate judge nor the district court made a specific finding on that issue. It appears that both assumed, without deciding, that Polk initiated the meeting, but then rejected Howard's claim by finding that the meeting did not constitute a "police-initiated custodial interrogation."

15

declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation," Edwards, 451 U.S. at 482, and that if the accused asserts his right to counsel, "`the interrogation must cease until an attorney is present,'" id. at 485 (quoting Miranda, 384 U.S. at 474). The Edwards rule, as enunciated by the Supreme Court, provides

> that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . .[Rather,] an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

Id. at 484-85; see also Minnick v. Mississippi, 498 U.S. 146, 153 (1990) (stating "that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney"); Savino, 82 F.3d at 599-600 (holding that "any confession obtained by interrogation reinitiated by police in the absence of counsel is inadmissible" unless "the defendant reinitiates discussion with police and then confesses").

Polk, to whom Howard initially confessed, did not testify at Howard's trial. The only confessions which Howard seeks to exclude are those made to Agent Battle and Lieutenant Hitchins. Every reviewing court has found that Howard initiated contact with Agent Battle through his probation officer Polk, and that he voluntarily made self-incriminating statements to both Agent Battle and Lieutenant Hitchins. See Howard v. State, No. 90-CP-23-3829 (S.C. 1991) (state post-conviction relief court finding that Howard "requested to talk to the F.B.I. about certain crimes"); Howard v. Evatt, C.A. No. 3:93-2361 (D.S.C. 1993) (district court finding that Howard "told Polk that he wanted to talk with the FBI" and that Howard's subsequent "October 7 and 8 statements were made voluntarily after initiation of com-

16

munication by petitioner"). Even more telling, Howard concedes that "[t]here is ample support in the record for the factual finding that" he "initiated contact with [the] FBI." (Petitioner's Reply Br. at 1.) In fact, he "does not contest that finding" on appeal. (Id.)

Based upon the aforementioned findings and Howard's concession, it is not surprising that Howard does not contend that his confessions to Agent Battle and Lieutenant Hitchins were made in violation of Edwards.**12** Rather, Howard's sole argument regarding the admissibil-

_____

**12** The dissent inexplicably criticizes the majority for failing to focus upon whether Howard's confessions to Agent Battle and Lieutenant Hitchins were made in violation of Edwards. See post at 44. The dissent, however, blatantly disregards the state court's finding that Howard initiated contact with the FBI. In fact, Howard concedes that the state court's finding is supported by ample evidence. (Petitioner's Reply Br. at 1.) Howard's concession is undoubtedly based in no small part upon a statement he signed prior to his confessions. The statement provides that:

> I, Ronnie Howard, have requested through my federal probation officer, Mr. Haywood Polk, to be interviewed by the F.B.I. about my involvement in criminal activities. I do not want the lawyer present who is representing me on Asheville armed robbery charges and understand that the F.B.I. Agents will ask me no questions about those charges.

(App. at 867). Because Howard admits that he initiated contact with the FBI, there was simply nothing upon which to "focus."

In addition, the dissent's assertion that "Polk convinced Howard to talk to the FBI in an attempt to get a deal," see post at 41, is simply unfounded. See Howard v. State, No. 90-CP-23-3829 (S.C. 1991) (state post-conviction relief court noting that Howard's trial counsel, upon investigation of the admissibility of the confessions, learned "that no promises either oral or written were made to [Howard], that [Howard] confessed to the authorities in the hope that he would get some type of concession or recommendation and in the hope that they would not seek the death penalty, and that for reasons only known to [Howard] he felt compelled to reveal information"). A review of the record reveals, and Howard does not dispute, that he initiated contact with the FBI, thereby waiving his rights under Edwards. See Oregon v. Bradshaw, 462 U.S. 1039, 1047 (1983) (concluding that "questions which evinced a willingness and a desire for a generalized discussion about[an] investigation" constitute initiation under the Edwards rule).

17

ity of the confessions to Agent Battle and Lieutenant Hitchins is that Polk's meeting with Howard, in which Howard initially confessed constituted a "police-initiated custodial interrogation" in violation of Edwards, i.e., a poisonous tree, and that the resulting confessions to Agent Battle and Lieutenant Hitchins were inadmissible "tainted fruit." Assuming, without deciding, that Polk's actions were on behalf of law enforcement and that his questioning of Howard while he was in custody constituted a "custodial interrogation" under Miranda,[13] we nevertheless reject Howard's claim.

_____

[13] As we previously noted, once a defendant invokes his Fifth Amendment right to counsel, any subsequent police-initiated custodial interrogation would violate Edwards. This circuit has not addressed whether custodial questioning by a probation officer constitutes a police-initiated interrogation under Edwards v. Arizona, 451 U.S. 477 (1981), or Miranda v. Arizona, 384 U.S. 436 (1966). The district court held that Polk's questioning of Howard did not violate Edwards because Polk was acting simply in his capacity as a probation officer when he spoke with Howard and not as an agent of the FBI. We need not decide whether Polk was acting as a law enforcement officer or whether he interrogated Howard because even if Howard's statements to Polk were obtained in violation of Edwards, we conclude that the statements made to Agent Battle and Lieutenant Hitchins were admissible.

Nevertheless, we address the dissent's apparent resolution of both of these issues. According to the dissent, whether an Edwards violation occurred turns upon who initiated the discussion between Polk and Howard. The dissent, therefore, necessarily finds, without any analysis or explanation, both that Polk was acting as an agent of the police and that the conversation between Polk and Howard constituted a "custodial interrogation" for Edwards purposes. Neither of these conclusions, however, is self-evident.

First, it is far from clear that Polk, a federal probation officer, was acting as an agent of the police when he met with Howard, his probationer. Unfortunately, the Supreme Court has not directly addressed this issue. In Minnesota v. Murphy, 384 U.S. 436 (1984), the Court rejected a probationer's claim that incriminating statements he made to his probation officer during a routine interview should have been suppressed because the officer failed to advise him of his Miranda rights. The Court concluded that the interview did not constitute a custodial interrogation giving rise to the protections of Miranda because the interview was not inherently coercive. Id. at 430-33. It is unclear from the Court's analysis, however, whether it considered the probation officer, whose admitted

18

Howard invoked his Fifth Amendment right to counsel prior to his interview with Polk, thereby triggering the protections of Edwards.

_____

primary purpose for arranging the interview was to obtain incriminating statements from her probationer, to be acting as an agent of the police. The circuit courts, however, have uniformly held that probation officers fulfilling routine duties are not agents of the police, but agents of the court, and therefore their probationers may not invoke the protections of Miranda. See Williams v. Chrans, 945 F.2d 926, 951 (7th Cir. 1991) (concluding that a probation officer conducting a custodial post-conviction presentence interview is acting as "`a neutral information gatherer for the court rather than [as an agent of] the police or prosecution, the parties most likely to coerce the defendant into relinquishing his Fifth Amendment rights'" (quoting United States v. Cortes, 922 F.2d 123, 127 (2d Cir. 1990)); United States v. Rogers, 921 F.2d 975, 979 (10th Cir. 1990) (concluding that "[t]he purpose of the presentence report . . . is neither prosecutorial nor punitive . . .[as t]he probation officer acts as an agent of the court for the purpose of gathering and classifying information"); United States v. Jackson, 886 F.2d 838, 842 n.4 (7th Cir. 1989) ("[W]e do not believe that a federal probation officer acts on behalf of the prosecution.") Investigating a probationer's alleged non-compliance with the terms of his probation is certainly a regular duty of a probation officer. Therefore, absent evidence that Polk stepped outside his neutral role as a federal probation officer, we question the dissent's assumption that Polk acted as an agent of the police.

Second, even assuming that Polk was acting on behalf of the police when he met with Howard, an argument rejected by both the federal magistrate judge, (J.A. at 213), and the district court, (J.A. at 301-02), the dissent offers no factual support for its conclusion that Polk "interrogated" Howard. See Rhode Island v. Innis, 446 U.S. 291, 299 (1980) (recognizing that not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation"). In fact, as discussed at n.2 & n.10, supra, the South Carolina Supreme Court examined the same events in Howard's direct appeal of his conviction for the Duncan murder and found that Polk did not "interrogate" Howard. See State v. Howard, 374 S.E.2d 284, 288 (S.C. 1988). Again, we do not attempt to decide these issues because they are not necessary to our resolution of the ultimate question of whether Howard's confessions to Agent Battle and Lieutenant Hitchins are admissible. We only point out these issues in response to the dissent's decidedly incomplete discussion of them.

19

See Edwards, 451 U.S. at 485 (holding that an accused who has invoked the right to counsel is not subject to further interrogation "unless the accused himself initiates further communication, exchanges, or conversations with the police"). Howard claims that Polk initiated the contact, approaching Howard in the hopes of extracting a confession from him. The State contends, however, that it was Howard who initiated contact with Polk, thereby waiving his right to counsel, when he asked Detective Warren of the Asheville Police Department to call Polk.

During the suppression hearing at trial, Howard never refuted the State's contention that he asked Detective Warren to allow him to speak with Polk.**14** Howard testified that "it was either a week and a half or maybe two weeks before I talked to my parole officer, [Haywood Polk]. He was called up by [Detective] Lee Warren, I think. I'm not sure about that. . . . And [Detective Warren] called Heywood [sic] up or I think that was what happened, and Heywood[sic] came up, and I talked to him." (App. at 1091.) Howard also testified that he and Polk enjoyed "a real close relationship" in which he "considered [Polk] not as a parole officer, but as my friend, and a person who I could talk to at different times about things." (App. at 1088.) Howard also consistently testified that at the October 3, 1985, meeting with Polk in which he agreed to speak with the FBI, "I just told him. I think I opened up to him about everything, and I tried to be as honest as possible. . . ." (App. at 1092.) During Howard's state PCR hearing, Polk testified that he was contacted by Detective Warren "on instructions from Ronnie Howard." (J.A. at 758.) The State also points to the

_____

**14** In his Reply Brief, Howard contends for the first time that his rights under Edwards were initially violated by Detective Warren, prior to Howard's meeting with Polk. This assertion is barred by his failure to raise it earlier. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 8-12 (1992) (holding that when a state has given petitioner a full and fair hearing on a claim and he has failed to develop material facts to support it, he is not entitled to develop further facts in a federal habeas evidentiary hearing unless he demonstrates either cause for the failure and prejudice resulting therefrom or a fundamental miscarriage of justice). Moreover, an examination of Howard's allegations convinces us that even if there was an Edwards violation by Detective Warren, it would not bar the admission of Howard's confessions to Agent Battle and Lieutenant Hitchins for the reasons outlined in Part II.B.1.c. of the majority opinion.

20

testimony of FBI Agent Drucilla Kurrle, who was present with Agent Battle when Howard was questioned. At trial, Agent Kurrle stated that the interviews with Howard began after "he contacted Mr. Polk and . . . requested to speak to an FBI agent." (App. at 1361.) In fact, at Howard's state PCR hearing, Howard's attorney attempted to use the fact that Howard contacted Polk to show that Howard wanted to cooperate with law enforcement.

We conclude, however, that it is immaterial whether Polk's interrogation of Howard constituted an Edwards violation (because either Howard initiated contact with Polk and then invoked his right to counsel, triggering his rights under Edwards anew, or Polk initiated contact with Howard after he invoked his right to counsel) because Howard's subsequent confessions to Agent Battle and Lieutenant Hitchins are not inadmissible "tainted fruits."[15] The "tainted fruits" doctrine is simply inapplicable absent a constitutional violation. See Oregon v. Elstad, 470 U.S. 298, 308 (1985) (concluding that the "fruit of the poisonous tree" doctrine did not apply to a suspect's second statement, made while in custody as a result of unwarned first statement obtained in violation of Miranda, because there was no actual infringement of the suspect's constitutional rights); Michigan v. Tucker, 417 U.S. 433, 445-46 & n.19 (1974) (refusing to apply "tainted fruits" doctrine to the testimony of a witness whose identity was discovered as a result of a statement obtained in violation of Miranda); United States v. Elie, 111 F.3d 1135, 1141 (4th Cir. 1997) (rejecting "application of the `fruit of the poisonous tree' doctrine to physical evidence discovered as the result of a statement obtained in violation of Miranda"); Correll v. Thompson, 63 F.3d 1279, 1289-91 (4th Cir. 1995) (refusing to apply "tainted fruits" doctrine to a third confession obtained as a result of two earlier confessions obtained in

---

[15] The dissent claims that we have "disembowel[ed] Edwards by dismissing [whether Howard initiated the discussion with his probation officer] as immaterial." See post at 42-43. Of course, we have done no such thing. Whether Howard initiated the discussion with his probation officer is material to whether his confession to Polk violated Edwards. Whether Howard's confession to Polk violated Edwards, however, is immaterial to the ultimate question of whether his subsequent confessions, which were not made in violation of Edwards, must be suppressed as fruit of the poisonous tree.

21

violation of Edwards), cert. denied, 116 S. Ct. 688 (1996). An Edwards violation, like a Miranda violation, is not itself a constitutional violation.**16** In Arizona v. Roberson, 486 U.S. 675 (1988), the Supreme Court explained that

> the prophylactic protections that the Miranda warnings provide to counteract the "inherently compelling pressures" of custodial interrogation and to "permit a full opportunity to exercise the privilege against self-incrimination," are implemented by the application of the Edwards corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect."

Id. at 681 (citations and quotations omitted)); see also id. at 682 ("The Edwards rule . . . serves the purpose of providing `clear and unequivocal' guidelines to the law enforcement profession."); id. at 688 (Kennedy, J., dissenting) (noting that "the rule of Edwards is our rule, not a constitutional command"); Correll, 63 F.3d at 1290 (concluding that "[a] breach of the rule established in Edwards is [ ] a technical violation of Miranda, not a Fifth Amendment violation."). Accordingly, even if we were to accept Howard's argument that his statement to Polk, including his request to speak to the FBI, was obtained in violation of Edwards, the "fruit of the poisonous tree" doctrine would not bar admission of Howard's confessions to Agent Battle and Lieuten-

_____

**16** The dissent claims that our analysis "misses the whole point of Edwards," because "[t]he Edwards rule operates even absent a constitutional violation." See post at 43. Unfortunately, the dissent's criticism misses the whole point of this case. We do not dispute that even a voluntary confession made in violation of Edwards must be suppressed. As a result, Howard's confession to Polk, albeit voluntary, was inadmissible if obtained in violation of Edwards. The question presented in this case, however, is whether a statement made in violation of Edwards taints a subsequent confession not made in violation of Edwards. It is the tainted fruits doctrine, not the Edwards rule, that does not operate absent a constitutional violation.

ant Hitchins. Only if Howard could show that his statement to Polk was obtained in violation of his Fifth Amendment right against compulsory self-incrimination and that insufficient time had passed to dissipate the taint, might the "fruit of the poisonous tree" doctrine bar admission of Howard's subsequent confessions to Agent Battle and Lieutenant Hitchins. Cf. Correll, 63 F.3d at 1290 (holding that, under Elstad, the first question that must be answered when determining whether a subsequent confession is tainted by an earlier confession "is whether the initial confession[ was] obtained in violation of [the defendant's] Fifth Amendment rights -- i.e., whether [it was] involuntary -- or whether the confession[ was] voluntary but obtained in technical violation of Miranda").

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law." U.S. Const. Amend. V. Whether a statement is voluntary within the meaning of the Fifth Amendment is a mixed question of law and fact subject to de novo review. See Miller v. Fenton, 474 U.S. 104, 111-12 (1985); Fields v. Murray, 49 F.3d 1024, 1030 (4th Cir.) (en banc), cert. denied, 116 S. Ct. 224 (1995). The Supreme Court has held "that coercive police activity is a necessary predicate to the finding that a [statement] is not `voluntary' within the meaning of the Due Process Clause." Colorado v. Connelly, 479 U.S. 157, 167 (1986); see also Elie, 111 F.3d at 1143. Whether Howard's statement to Polk was the result of coercive conduct or activity can be answered only by reviewing the totality of the circumstances under which the statement was made. See United States v. Braxton, 112 F.3d 777, 781 (4th Cir.) (en banc), cert. denied, 118 S. Ct. 192 (1997).

Howard admitted that Polk did not promise him anything and specifically denied that Polk "coerced" him in return for his cooperation. (App. at 1105.) In addition, Howard previously had numerous prior encounters with federal, state, and local law enforcement authorities. See United States v. Watson, 423 U.S. 411, 424-25 & n.14 (1976) (noting that the absence of any indication that the defendant was a "newcomer to the law" is an important factor in determining whether consent was voluntary). He was a high school graduate and had served in the military. Based on the totality of the circumstances, we conclude that Howard's statements to Polk were not "involuntary"

23

within the meaning of the Fifth Amendment, and therefore, the "fruit of the poisonous tree" doctrine is inapplicable to Howard's subsequent confessions to Agent Battle and Lieutenant Hitchins. See Correll, 63 F.3d at 1291 (concluding that a third confession "could not have been tainted" by initial confessions because although the initial confessions were obtained in violation of Edwards, they were not obtained in violation of the Fifth Amendment).[17] Accordingly, we affirm the trial court's denial of Howard's motion to suppress them.

2.

Howard next contends that when the trial court decided to admit the confessions in the guilt phase of the trial, it violated his Fifth Amendment right not to testify and the rule of completeness by failing to admit the statements in their entirety.[18] Based on the same rea-

_____

[17] The dissent suggests that "Edwards is now all but gone in the five states of the Fourth Circuit." See post at 39. It is safe to say, however, that the reports of Edwards' demise have been greatly exaggerated. Notwithstanding today's decision, direct evidence obtained in violation of Edwards is still inadmissible. As a result, had Howard not initiated contact with the authorities, his subsequent confessions would have been inadmissible. What the dissent inexplicably ignores, however, is that Howard initiated the discussions with Agent Battle and Lieutenant Hitchins, thereby waiving his previously invoked rights. Therefore, as clear Supreme Court and Fourth Circuit precedents dictate, these subsequent confessions were admissible absent a constitutional violation. See Oregon v. Elstad, 470 U.S. 298 (1985); Michigan v. Tucker, 417 U.S. 433 (1974); United States v. Elie, 111 F.3d 1135 (4th Cir. 1997); Correll v. Thompson, 63 F.3d 1279 (4th Cir. 1996).

[18] In United States v. Wenzel, 311 F.2d 164 (4th Cir. 1962), we held that ordinarily a defendant's entire statement should be admitted under the rule of completeness:

> When a confession is admissible, the whole of what the accused said upon the subject at the time of making the confession is admissible and should be taken together; and if the prosecution fails to prove the whole statement, the accused is entitled to put in evidence all that was said to and by him at the time which bears upon the subject of the controversy including any exculpatory or self-serving declarations connected therewith.

24

soning, he also challenges the trial court's limitation on his cross-examinations of Agent Battle and Lieutenant Hitchins which prevented them from relating to the jury any information regarding the culpability of Weldon unless Weldon's own confession corroborated it. We reject this argument because the trial court excluded only portions of Howard's confession that inculpated Weldon and did not exculpate Howard.

Due to <u>Bruton</u> considerations, the trial court directed Agent Battle and Lieutenant Hitchins to omit from their testimony any part of Howard's confessions that inculpated Weldon, his codefendant. <u>See</u> <u>Bruton v. United States</u>, 391 U.S. 123, 133-34 & n.10 (1968) (holding that the introduction of a jointly tried, non-testifying codefendant's statement violates the Sixth Amendment Confrontation Clause if the statement contains incriminating evidence concerning a defendant).**19**

_____

<u>Id.</u> at 168 (citations omitted). The rule enunciated in <u>Wenzel</u>, partially codified as Rule 106 of the Federal Rules of Evidence, is simply an evidentiary rule, not a rule of constitutional law. <u>See United States v.</u> <u>Wilkerson</u>, 84 F.3d 692, 696 (4th Cir. 1996), <u>cert. denied</u>, 118 S. Ct. 341 (1997); Fed. R. Evid. 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."). State court trial rulings regarding the admission and exclusion of evidence are cognizable in federal habeas corpus review only to the extent that they violate specific constitutional provisions or are so egregious as to render the entire trial fundamentally unfair, thereby violating the Due Process Clause of the Fourteenth Amendment. <u>See Estelle v.</u> <u>McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Spencer v. Murray</u>, 5 F.3d 758, 762 (4th Cir. 1993). First, we note that Howard's confessions, although transcribed by Agent Battle and Lieutenant Hitchins from their notes of their respective reports, were neither written by Howard, signed by Howard, tape-recorded, nor introduced into evidence in written form. Therefore, we question whether the rule of completeness even applies to this case. <u>See Wilkerson</u>, 84 F.3d at 696 (holding that the rule of completeness "applies only to writings or recorded statements, not to conversations"). Furthermore, even if the rule were to apply, we would conclude as a matter of law that the exclusion of portions of Howard's confessions did not rise to the level of a constitutional violation.

**19** Howard and Weldon were tried jointly over their motions to sever. Because Howard chose not to testify in the guilt or penalty phase of the

25

Howard's complete confessions, with their incriminating references to Weldon, could have been used only if he and Weldon had been tried separately or if Howard had been subject to cross-examination by Weldon. The Supreme Court has clearly stated that separate trials are not required under these circumstances:

> It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. . . . Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987). The Court also has rejected the alternative of foregoing the use of a codefendant's confession because "[t]hat price also is too high, since confessions `are more than merely "desirable"; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.'" Id. at 210 (quoting Moran v. Burbine, 475 U.S. 412, 426 (1986)). Therefore, when analyzing its alternatives, the trial court is called upon to balance the rights of the defendant, the rights of the codefendant, society's interest in convicting only the guilty, and the efficient administration of justice. After comparing the original statements with the redactions, we agree with the district court that the excluded statements were not exculpatory and that their exclusion did not materially alter the meaning of the confessions. Thus, we find no constitutional error and affirm.

_____

trial, his confessions were admissible as statements against interest. His statements inculpated Weldon, however, and so although the statements were admissible against Howard, their admission in the absence of Howard's availability for cross-examination violated Weldon's rights under the Confrontation Clause of the Sixth Amendment. The trial court resolved the conflict by admitting Howard's statements, only after redacting the portions implicating Weldon.

26

Agent Battle took handwritten notes of Howard's October 8, 1985, confession. He later memorialized these notes in a typed report as follows:

> HOWARD noticed that there was "a lot of plastic in the car, like a seat cover or whatever." HOWARD "had the bright idea of using that to put her out - not kill her, just put her out."
>
> HOWARD placed the plastic over the female's head. RICK [Weldon] hit her several times in the stomach. When HOWARD "took the bag off, she was still, like maybe she was `playing possum'." HOWARD thought that he felt a pulse. RICK then "reapplied pressure." HOWARD "thought she was knocked out" but added, "I don't think I really cared, to be honest." He did not realize that she was dead until he was driving around looking for a place to leave her. At that time he touched her body, which felt cold, and realized that she was dead. HOWARD insisted "I'm being honest - I don't know if he killed her or I killed her."

(J.A. at 559.) Over Howard's objection, the trial court instructed Agent Battle not to testify as to the portions of the confession inculpating Weldon, unless the inculpatory statement had been corroborated by Weldon's own statement. Agent Battle then testified:

> Q. What did Mr. Howard do next?
>
> A. Well, he said he noticed that there was a lot of plastic in the car, like seatcovers or something like that, and that he had the idea of using those plastic--that plastic material to--to put her out. He said not to kill her, just to put her out.
>
> Q. What did Mr. Howard do at that point?
>
> A. Well, he placed the plastic over the woman's head.
>
> Q. According to Howard what did Rick do at that time?

27

A. He told me that Rick hit the woman in the stomach several times.

Q. Did Mr. Howard eventually take the plastic off the victim's head?

A. Yes. He said he took the bag off her head or the plastic off her head and that the woman was still. He thought then that she was, and he used the words, I have them in quote [sic], "playing possum." He thought at that time that he had felt a pulse, that she was still alive. He said he thought that she was knocked out, but he said, "I don't think I really cared to be honest."

(J.A. at 626-27.) This modified version omits Howard's statement that Weldon "reapplied pressure."

Lieutenant Hitchins also drafted a typed report of Howard's October 16, 1985, confession, based on his handwritten notes taken during the interview. His report stated:

[Howard] grabbed the girl and pushed her into her car and got in behind the wheel, and Rickey was driving their car. He stated that he drove to a place that had no houses around, and parked on the side of the road where he put a plastic bag over her head, and was going to make her pass out. He stated that he was holding the bag until she quit fighting and was going to turn [her] loose but Rickey grabbed the bag and held it. He stated that he got in the back seat and he grabbed and pulled her over the seat into the back while Rickey was helping him get her over the seat. They started to drive and that is when he noticed she was not breathing, and they stopped.

(J.A. at 553.) At trial, however, Lieutenant Hitchins, following the trial court's redaction instructions, testified as follows:

Q. What did they do when they got to the area where there were no houses around? Did they stop or keep going or --

28

A. They stopped the vehicles, and at that point in time Mr. Howard placed the plastic bag over the victim's head.

Q. Did he ever release the plastic bag from over the victim's head?

A. Yes, sir. He said that he held the bag over her head until she quit fighting, and then he released the bag.

Q. What did they do or what did Mr. Howard say he did with the victim after he--after she quit fighting and he took the plastic bag off her head?

A. Said that he got into the back seat of the victim's vehicle, started pulling the victim into the back seat, and at that time Mr. Weldon helped him put the victim in the back seat of her vehicle.

(J.A. at 573.) The redaction excludes Howard's statement that he "was going to turn [the bag] loose but Rickey grabbed the bag and held it."

Howard argues that the unredacted portions of both statements show that Howard lacked the intent to kill because he released the plastic when he thought that Le was still alive. Moreover, Howard claims that the jury could have concluded from his original statements that Weldon, not Howard, actually killed Le. Even accepting Howard's argument that the jury could have concluded from his complete confessions that Howard did not intend to, and in fact did not, kill Le, this assertion would not in any way diminish Howard's culpability for Le's murder. As the trial court charged the jury under South Carolina law:

> When one does an act in the presence of and with the assistance of another, the act is considered to have been done by both, and where two or more acting with a common design or intent are present at the commission of the crime, it matters not by whose immediate agency the crime is committed, all are guilty. The hand of one is the hand of all.

29

(J.A. at 656.) In other words, the State had to prove only that Howard and Weldon, working together and with malice aforethought, were jointly responsible for Le's death. See S.C. Code Ann. § 16-3-10 (Law Co-op. 1985) (defining murder as "the killing of any person with malice aforethought, either express or implied"). Therefore, because South Carolina does not require that a defendant have specific intent to commit murder, nothing in Howard's original confessions was exculpatory for Fifth Amendment purposes and in no way diminished Howard's legal blameworthiness for the murder. See State v. Foust, 479 S.E.2d 50, 51 (S.C. 1996) (holding that wrongful intent to injure another may give rise to finding of malice to support verdict of murder) (citing State v. Johnson, 352 S.E.2d 480, 481 (S.C. 1987)). Nor did the redaction distort the meaning of the confessions. Accordingly, we affirm the admission of the testimony concerning Howard's confessions during the guilt phase of the trial.

3.

Although we have determined that the redactions did not violate Howard's Fifth Amendment right not to testify, a different issue arises when we consider whether the exclusion of the redacted statements during the sentencing phase violated Howard's Eighth Amendment rights. A defendant may present all relevant mitigating circumstances to the sentencer for its consideration of whether to impose the death penalty. See Lockett v. Ohio, 438 U.S. 586, 604 (1978). In Skipper v. South Carolina, 476 U.S. 1 (1986), the Supreme Court held that the Eighth and Fourteenth Amendments require admission of relevant mitigating evidence in the penalty phase of a defendant's capital trial. Skipper, 476 U.S. at 4. The Court stated that "in capital cases the `"sentencer . . . [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."'" Id. (quoting Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (quoting Lockett, 438 U.S. at 604)). In other words, "the sentencer may not refuse to consider or be precluded from considering `any relevant mitigating evidence.'" Id. (quoting Eddings, 455 U.S. at 114); see also Hitchcock v. Dugger, 481 U.S. 393, 399 (1987) (a jury in a capital case must consider not only statutory mitigating evidence, but also nonstatutory factors as well).

30

Howard argues that the omitted portions of his confessions impli-
cate Weldon as Le's actual murderer, and therefore, although these
omitted portions may not be exculpatory under South Carolina law,
they nonetheless constitute mitigating evidence that Howard should
have been allowed to present to the jury during his cross-examination
of Agent Battle and Lieutenant Hitchins in the penalty phase of his
trial. Whether the trial court's rulings limited the jury's consideration
of mitigating evidence is a mixed question of law and fact. See
Kennedy v. Herring, 54 F.3d 678, 682 (11th Cir. 1995) (whether a
trial court's instructions to the jury improperly limited its consider-
ation of mitigating evidence is a mixed question of law and fact). As
such, we defer to the state court's findings of fact, but review its legal
conclusions de novo. After reviewing the record, we find ourselves in
complete agreement with both the South Carolina Supreme Court and
the district court. Both courts rejected Howard's claim, finding that
nothing in his confessions could be construed as mitigating. See State
v. Howard, 369 S.E.2d 132, 138 (S.C. 1988) (finding that "Howard's
unredacted confession contained no mitigating evidence," and there-
fore, that there was "no prejudice from its exclusion at the penalty
phase of the trial"); (J.A. at 299 (district court opinion) (concluding
that "there is nothing truly exculpatory or mitigating about the unre-
dacted statement[s]").) Therefore, we conclude that Howard's Eighth
Amendment rights were not violated.

In his confession to Agent Battle, Howard stated that he placed the
plastic over Le's head and held her until "she was still." He thought
Le was just "playing possum" and claimed that he "felt a pulse." He
said that after "Rick [Weldon] then reapplied pressure," he continued
to think that "she was knocked out." (J.A. at 559.) Only later, when
Howard and Weldon were looking for a place to leave Le's body, did
Howard realize that Le was dead. Howard then conceded "I'm being
honest -- I don't know if he killed her or I killed her." (J.A. at 599.)
When considered as a whole, Howard's unredacted confession in no
way suggests that he believed Weldon killed Le. Rather, he admitted
that even after Weldon's assault, Howard thought that Le was still
alive. Moreover, although Howard said that he thought she was only
unconscious when he released his grip and Weldon grabbed her, he
plainly conceded that he did not know whether he or Weldon actually
killed Le.

31

Similarly, in the unredacted version of Howard's confession to Lieutenant Hitchins, Howard stated that "he put a plastic bag over [Le's] head, and was going to make her pass out." Again, he claimed that he held "the bag until she quit fighting and was going to turn loose but Rickey [Weldon] grabbed the bag and held it." (J.A. at 553.) Howard did not tell either Agent Battle or Lieutenant Hitchins that Weldon actually killed Le. Rather, he simply stated that it was not until they drove away, after both men had assaulted her, that he realized she was not breathing. (J.A. at 553.)

Howard extracts two single phrases from the nine typed pages of notes transcribed by Agent Battle and Lieutenant Hitchins and construes them as a statement that Weldon, not Howard, actually killed Le. To accept this characterization of the record requires a tortured and speculative interpretation of two phrases lifted out of Howard's confessions and complete disregard of the remainder of the statements and the context of the phrases within them. In determining whether the extracted phrases constitute "relevant mitigating evidence," we cannot ignore the rest of Howard's account. When both statements are reviewed in context, the alleged assertion of innocence is completely negated by Howard's admission that he did not know whether he or Weldon killed Le and that he thought she was "just knocked out," even after Weldon assaulted her. Moreover, Howard admitted to Agent Battle that he drove the car that "bumped" Le; that he brandished the .357 magnum handgun and forced Le back into her automobile; that he had the "bright idea" to cover Le's face with plastic to "put her out"; that he put the plastic over Le's face; that he stated, "Maybe it was because of the black beauties,[20] but her death didn't really bother me at all"; that he and Weldon removed all of Le's clothes, washed her body with soda to remove any fingerprints, and left her body in a deserted area among kudzu vines after again washing it in a mud puddle; and that he returned to Charlotte to dispose of Le's personal effects. (J.A. 558-61.) In sum, we agree with the South Carolina Supreme Court that Howard's confession, rather than providing any mitigating evidence, clearly demonstrates that Howard "actually was the leader and decision-maker." Howard, 369 S.E.2d at 138.[21] We are firmly convinced that no reasonable juror could have

_____

[20] "Black beauties" are the street name for a type of amphetamine drug.

[21] The South Carolina Supreme Court's finding that Howard's confessions indicated that "Howard played the major role" in Le's murder was

32

found that the unredacted portions of Howard's confession were evidence that Weldon, rather than Howard, actually killed Le.[22] Nothing in the redactions altered Howard's personal culpability for Le's death. Moreover, nothing in the redactions could be construed as mitigating evidence in Howard's favor.

And finally, in response to Howard's argument that it was important for the jury to know who actually killed Le, a reading of Howard's unredacted confession readily reveals Howard's own uncertainty as to whether he or Weldon committed the final act of murder. (J.A. at 559 ("Howard insisted `I'm being honest - I don't know if [Weldon] killed her or I killed her.'").) There is simply no evidence upon which a reasonable juror could conclude who killed Le.[23]

_____

not inconsequential. As a result of this finding, the court vacated Weldon's sentence, concluding that the exclusion of the statements at issue prevented Weldon from presenting relevant evidence in mitigation.

[22] The only possible mitigating circumstance that could be inferred from Howard's confession is that he lacked the intent to kill Le. In other words, that he wanted only to render her unconscious and he released her when he thought she was still alive. Howard presented his alleged lack of intent to kill Le to the jury numerous times through the testimony of Agent Battle and Lieutenant Hitchins. Agent Battle testified that Howard's original plan was merely to steal Le's car and not to harm her. Agent Battle further stated that Howard reported that he intended to use the plastic bag "`not [to] kill [Le], [but] just to put her out.'" (J.A. at 636.) Similarly, Lieutenant Hitchins testified that both Howard and Weldon consistently stated that their only purpose in coming to Greenville that night was to steal a car and that neither man had any intention of harming anyone. Based on the foregoing, we conclude that any error in the exclusion of the statements regarding Howard's alleged lack of intent was harmless because it could not have had a "substantial and injurious effect or influence" on the jury's decision to recommend a sentence of death for Howard. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Howard's alleged lack of intent to kill Le was thoroughly presented to the jury. See Buchanan v. Angelone, 103 F.3d 344, 349 (4th Cir. 1996) (finding no constitutional violation when excluded mitigating evidence "would have had only cumulative probative value"), cert. granted in part, 117 S. Ct. 1551 (1997).

[23] At this point, we must take issue with the dissent's dramatic, yet unfounded, assertion that the majority holds that the identity of the actual

Moreover, contrary to the dissent's assertion that "anything that makes Weldon look worse <u>necessarily</u> helps Howard," <u>see post</u> at 50, Weldon's intent to kill Le is not mitigating evidence in favor of Howard. Weldon's state of mind is not relevant to the jury's determination of the proper punishment for Howard because the Eighth Amendment requires an <u>individualized</u> determination of sentencing in death penalty cases. <u>See Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978). In conclusion, we agree with the South Carolina Supreme Court's finding that his "unredacted confession contained no mitigating evidence," and therefore, there was "no prejudice from its exclusion at the penalty phase of the trial." <u>State v. Howard</u>, 369 S.E.2d 132, 138 (S.C. 1988). Based on the foregoing, we reject Howard's Eighth Amendment claims.

C.

Howard also contends that the trial court erroneously failed to instruct the jury on the lesser included offense of manslaughter when it recharged the jury on the elements of murder. The trial court originally charged the jury on both murder and manslaughter. During deliberations the jury requested "the interpretation of the charge of murder you previously provided." The trial court complied with the request and repeated only the murder instruction. Howard did not object. "Errors at trial not objected to, in contravention of State contemporaneous objection rules, are not cognizable in federal habeas corpus proceedings, absent a showing of cause for non-compliance and prejudice." <u>Satterfield v. Zahradnick</u>, 572 F.2d 443, 446 (4th Cir. 1978) (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977)). We readily dismiss Howard's claim, concluding that Howard was in no way prejudiced by the trial court's refusal to recharge a manslaughter instruction that was not requested and previously had been charged. <u>See</u>

_____

killer in a crime involving multiple defendants is irrelevant for sentencing purposes. No one disputes that a defendant should be allowed to present evidence demonstrating that he was not the "triggerman." However, in this case, as the dissent acknowledges, Howard admitted that he did not know who actually killed Le. The dissent, therefore, argues that evidence should have been admitted that simply does not exist, <u>i.e.</u>, that Weldon actually killed Le.

34

Sturges v. Matthews, 53 F.3d 659, 661 (4th Cir. 1995) ("A judgment will be reversed for error in jury instructions `only if the error is determined to have been prejudicial, based on a review of the record as a whole.'" (quoting Wellington v. Daniels, 717 F.2d 932, 938 (4th Cir. 1983))).

D.

Next, Howard contends that he was denied effective assistance of counsel in violation of the Sixth Amendment because trial counsel failed to investigate and present mitigating evidence during sentencing concerning his adaptability to prison, his military record, and his school performance. A claim of ineffective assistance of counsel is a mixed question of law and fact which we review de novo. See Strickland v. Washington, 466 U.S. 668, 698 (1984). To prove a constitutional claim for ineffective assistance of counsel, a defendant must show both that his counsel's representation was deficient and that he was prejudiced by the deficiency. See id. at 687. As to prison adaptability, Howard's counsel offered into evidence several witnesses who testified that Howard was capable of adapting to prison life. Although counsel failed to submit evidence regarding Howard's prior incarceration for armed robbery, he presented three North Carolina law enforcement witnesses describing Howard's remorseful state after Le's murder and his cooperation with the authorities surrounding the instant charges. We agree with the state PCR court that Howard's past prison record presented a "double[-]edge[d] sword" in that any further evidence of Howard's prior federal prison experience may have detrimentally highlighted his past criminal record. Regarding counsel's failure to present evidence regarding his military record and school performance, we agree with the other courts that have reviewed the record that Howard's military and school history were, at best, "checkered," and would have hurt him as much as helped him.[24] Therefore, counsel's decision not to introduce his military and school records into evidence was not deficient. See Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995) (noting that counsel's use of reasonable and acceptable trial tactics does not constitute ineffectiveness), cert. denied, 116 S. Ct. 2533 (1996).

_____

[24] For example, Howard was convicted of armed robbery while serving as a military policeman.

35

E.

Howard claims that he was unduly prejudiced when the prosecutor, during closing arguments in the sentencing phase of Howard's trial, violated his Fifth Amendment right against self-incrimination by improperly commenting on his failure to testify. The prosecutor made the following remarks:

> In order to rehabilitate it must come from the heart. It's like an alcoholic. An alcoholic, you have to admit your problem before you can get treated. You're half way there if you admit your problem. For you to be able to rehabilitate, you must start with remorse. Where is the remorse in this case? There is no remorse in this case. There is no remorse in the actions of Dana Weldon and Ronnie Howard, because one week later, they're out on another crime spree in Asheville, North Carolina. Where is the remorse? There is no remorse in Ronnie Howard. He told these witnesses, "I don't think I really cared." He told Mr. Lee Warren, the detective from Asheville, "Well, the first one bothered me some, but after that I really didn't care." Where is the remorse? There is none.

(App. at 1612-13.)

Although the Fifth Amendment forbids comment by the prosecution on a defendant's failure to testify, see Griffin v. California, 380 U.S. 609, 615 (1965), when a prosecutor's comments are merely "a fair response to a claim made by defendant or his counsel," there is no constitutional violation, see United States v. Robinson, 485 U.S. 25, 32 (1988). We agree with the South Carolina Supreme Court and the federal district court, which both rejected Howard's claim, that this statement was neither a direct nor an indirect comment on his failure to testify. When considered in context, these remarks are a simple repeat of the evidence demonstrating that Howard and Weldon had robbed another store a mere week after murdering Le, and Howard's own statement that Le's death "really didn't bother him at all." Moreover, these remarks were in direct response to defense counsel's argument that Howard was remorseful for his actions. See id. Accordingly, we conclude that the comments did not violate Howard's con-

36

stitutional rights and affirm the district court's denial of habeas relief on this ground.

F.

Finally, Howard claims that his due process rights were violated when the prosecution allowed the jury to use as scrap paper the reverse side of outdated form letters, used by a previous prosecutor to thank former jurors for their service. Howard claims that this action was an impermissible ex parte communication between the prosecutor and the jury. This argument is meritless.

In Remmer v. United States, 347 U.S. 227 (1954) (Remmer I), the Supreme Court held that

> any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Id. at 229. In accordance with Remmer I, we have established a three-step process for analyzing allegations of ex parte juror contact. First, the party attacking the verdict must introduce competent evidence that there was an extrajudicial communication or contact, and that it was "`more than innocuous interventions.'" United States v. Cheek, 94 F.3d 136, 141 (4th Cir. 1996) (quoting Haley v. Blue Ridge Transfer Co., 802 F.2d 1532, 1537 n.9 (4th Cir. 1986)). If this requirement is satisfied, the Remmer I presumption automatically arises. Then, the burden shifts to the prevailing party to demonstrate "that there exists no `reasonable possibility that the jury's verdict was influenced by an improper communication.'" Id. (quoting Stephens v. South Atlantic Canners, Inc., 848 F.2d 484, 488-89 (4th Cir. 1988)).

37

Years prior to Howard's trial, a former prosecutor printed numerous copies of a form letter, which he sent to former jurors thanking them for their service. Apparently in an effort to conserve resources, the county clerk bound the unused form letters and used them, reverse side up, for notepads. While the jury in Howard's trial was deliberating, they made notes on the scrap paper that had been provided. The state PCR court, after conducting a full evidentiary hearing, found that there was no evidence to suggest that any member of the prosecutor's office attempted to contact any juror, directly or indirectly, or to influence them. Moreover, there was no evidence presented to show that the prosecutor, at any time prior to the state PCR hearing, had any knowledge that the reverse side of the form letters had been used as scrap paper. Accordingly, the state PCR court dismissed Howard's claim, finding that no improper ex parte contact occurred.

The state PCR court's factual findings are entitled to a presumption of correctness. See Rushen v. Spain, 464 U.S. 114, 120 (1983) (per curiam) (a state court's post-trial finding of the effect of ex parte communication on juror impartiality is a "fact" deserving "a high measure of deference"); Johnson v. Maryland, 915 F.2d 892, 896 (4th Cir. 1990) (same). The substance of the ex parte communications and their effect on juror impartiality are questions of historical fact entitled to this presumption absent "convincing evidence" to the contrary. See Rushen, 464 U.S. at 120. Here, the state court necessarily concluded that the jury's deliberations were not biased. Howard has failed to present evidence that the jurors even read the form letters, and thus he fails to meet the first prong of the Remmer I test. Even assuming that the jurors were aware of the form letters, we conclude that any error was harmless as the form letters were nothing "more than innocuous interventions," Cheek, 94 F.3d at 141, that had no "`substantial and injurious effect or influence in determining the jury's verdict,'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

III.

In conclusion, finding no constitutional errors, we refuse to disturb the conviction and sentence rendered against Howard by South Carolina's state court system. Accordingly, we affirm the district court's denial of habeas relief to Howard.

38

AFFIRMED

MICHAEL, Circuit Judge, dissenting:

Under Edwards v. Arizona, 451 U.S. 477 (1981), a suspect in custody only has to ask for a lawyer once. Thereafter, the suspect cannot be questioned without counsel present unless he himself initiates the contact with authorities. Here, Ronnie Howard invoked his Fifth Amendment right to counsel one day before his federal probation officer came to see him. Howard's unwarned confession to the probation officer prompted that officer to arrange a meeting between Howard and the FBI, which, in turn, led to a meeting with a deputy sheriff. Howard made separate Miranda-warned confessions to the FBI and the deputy, and those two confessions were admitted at trial. The majority holds that it is immaterial whether Howard initiated the meeting with his probation officer because his confession to that officer was not actually coerced in a constitutional sense. Thus, according to the majority, the resulting Miranda-warned confessions to the FBI and the deputy were not tainted and were admissible. This holding is in direct conflict with Edwards. Under Edwards, once a suspect asks for a lawyer, there can be no police interrogation unless the suspect initiates it. The majority has circumvented this rule, and Edwards is now all but gone in the five states of the Fourth Circuit.

In addition, the majority ignores well-established Eighth Amendment precedent that governs the admission of mitigating evidence at sentencing. The state trial judge allowed only part of Howard's later confessions to be introduced. The redacted confessions were admitted for their truth, both at trial and at sentencing. Because of the redactions, the jury never heard the climax of Howard's chilling story, when he described how Weldon reapplied pressure to make sure the victim died. The judge correctly excluded the redacted portions in the guilt phase of the trial pursuant to Bruton v. United States, 391 U.S. 123 (1968), because they shifted blame to Weldon. In the penalty phase, however, the full story should have come in: the Eighth Amendment gives Howard the right to have the sentencing jury hear any mitigating evidence about his personal history or the circumstances of the offense. The trial judge and the majority should have recognized that any information that shifts ultimate blame to another is, by definition, mitigating evidence about the circumstances of the

39

crime. Because the majority errs twice with respect to the confessions, circumventing Edwards and ignoring the Eighth Amendment, I must respectfully dissent.

I.

On September 12, 1985, Howard was arrested and jailed in North Carolina for a robbery unrelated to the Chinh Le murder. Immediately thereafter, South Carolina authorities sought to question Howard, but his lawyer told them on September 18 and 24 that Howard could not be interrogated unless he (the lawyer) was present. Howard and his lawyer did meet with the South Carolina authorities on October 2, but after an unsuccessful attempt to obtain immunity, Howard invoked his right to counsel and refused to talk. The very next day Howard's federal probation officer, Heywood Polk, came to the Buncombe County Jail to see Howard. The majority claims it is immaterial whether Howard or Polk initiated this meeting. In any event, Howard's lawyer was not notified about the meeting, and Polk did not give Howard the Miranda warnings. Howard proceeded to confess to Polk "about everything," including the Le murder and several other crimes.[1] Polk's advice to Howard was directly contrary to that given by his

—————————————————————————————————

[1] The majority assumes for purposes of its own analysis that Polk's questioning of Howard was custodial interrogation. Yet the majority would deny me the same assumption. See ante at 18-19 n.13. The assumption is sound because Miranda and Edwards protections should apply when a probation officer interrogates a suspect in custody before indictment or trial. See United States v. Andaverde, 64 F.3d 1305, 1311 (9th Cir. 1995) ("[C]ustodial statements made to probation officers are subject to the same voluntariness analysis as statements made to other law enforcement officers"). Of course, a probation officer does not have to give Miranda warnings before a non-custodial meeting, see Minnesota v. Murphy, 465 U.S. 420, 431 (1984), or before a routine presentence interview, see United States v. Hicks, 948 F.2d 877, 885 & n.8 (4th Cir. 1991). Here, Howard was in jail, and Polk was definitely not conducting a presentence interview. Polk, then, was engaging in custodial interrogation if his approach to Howard was "reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Because Howard placed great trust and confidence in Polk, the meeting predictably turned into a confessional. The premise of custodial interrogation is therefore reasonable.

40

lawyer: Polk convinced Howard to talk to the FBI in an attempt to get a deal.**2** On October 8, five days after his meeting with Polk, Howard confessed to FBI agent Battle after signing a <u>Miranda</u> waiver. A week later, on October 16, Howard again waived his <u>Miranda</u> rights and confessed to Lieutenant Hitchins, a South Carolina sheriff's deputy. Howard's lawyer was not notified about any of these meetings, even though Howard had invoked his right to counsel only a few days earlier, on October 2. At Howard's murder trial the state introduced redacted versions of Howard's confessions to the FBI and the deputy.

The ultimate question is whether <u>Edwards</u> makes Howard's confessions to the FBI and the deputy sheriff inadmissible.**3** <u>Edwards</u> estab-

_____

**2** The majority, ante at 20, quotes Howard (from the suppression hearing) on how he "opened up to [Heywood Polk] about everything." After that testimony Howard continued as follows:

> Q . . . And as a result of opening up everything to [Polk], did part of that concern these charges that you are now on trial for your life for?
>
> A Yes, sir. I think--let's see, Heywood's exact words were, "You need to try to get as less time as possible off of this stuff." This is after I told him about the murders and other armed robberies and so forth, and he said that he had a friend in the F.B.I. that he was going to call to come up and talk to me in Buncombe County Jail.

App. at 1092.

**3** The majority misreads Howard's briefs when it says that "Howard does not contend that his confessions to Agent Battle and Lieutenant Hitchins were made in violation of <u>Edwards</u>." Ante at 17. Howard builds an argument based explicitly on <u>Edwards</u>, beginning with the following summary:

> Howard . . . invoked his right to counsel, a right that was not respected when his federal parole officer approached and interrogated him while he was still in custody on those charges. In the course of that interrogation Howard agreed to talk to other law enforcement officials, and eventually made statements to FBI Agent Battle and South Carolina Detectives Hitchins and Christie. . . . The admission of these statements violated Howard's Fifth Amendment right against compulsory self-incrimination.

Appellant's Opening Brief at 49; <u>see generally id.</u> at 49-56; Appellant's Reply Brief at 1-8.

41

lished a bright line rule: once a suspect in custody invokes his right to counsel, he cannot be questioned again without counsel present "unless the [suspect] himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 485 (1981).

The rule of Edwards supplements Miranda with added protection for exercising the Fifth Amendment privilege against self-incrimination. Before a jailed suspect has asked for a lawyer, he receives only the basic Miranda protection, the irrebuttable presumption that any unwarned statement to the police is involuntary (for Miranda purposes) and therefore inadmissible. Once the suspect invokes the right to counsel, however, he receives the added Edwards protection:

> if a suspect believes that he is not capable of undergoing [custodial] questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect.

Arizona v. Roberson, 486 U.S. 675, 681 (1988). Again, once a suspect asserts the right to counsel, police-initiated reinterrogation without counsel is prohibited. Any confession resulting from police-initiated reinterrogation is barred by Edwards even if the suspect waived his Miranda rights and even if the confession was voluntary under traditional due process analysis. See id. at 686; see also Minnick v. Mississippi, 498 U.S. 146, 151 (1990).

In this case, we know little about what Howard was thinking as he sat in the Buncombe County Jail. But we do know one thing: he invoked his right to counsel on October 2, 1985, and he flatly refused to talk to the police. Thus, unless Howard himself initiated further discussions with the authorities, the confessions he made in response to questioning by his probation officer, the FBI, and the deputy are all inadmissible. That is the clear command of Edwards.

The first question is whether Howard initiated the discussion with his probation officer. The majority disembowels Edwards by dismiss-

42

ing this question as immaterial. As Justice Kennedy, writing for the Court, has explained, "[t]he merit of the Edwards decision lies in the clarity of its command and the certainty of its application." Minnick, 498 U.S. at 151. The majority ignores this guidance from the Supreme Court and constructs a complex detour around the clear mandate of Edwards. First, it says that Edwards is not a constitutional rule. Second, it assumes that Howard's statement to Polk, including his agreement to speak to the FBI, was obtained in violation of Edwards. Thus, it does not matter if the probation officer initiated the meeting. Third, the majority says that notwithstanding any Edwards violation, Howard's subsequent confessions to the FBI and the deputy are admissible unless the "fruit of the poisonous tree" doctrine applies. In other words, if Howard's October 3rd confession to Polk was voluntary (not coerced) under traditional Fifth Amendment standards, there is no "poisonous tree" and the subsequent (resulting) confessions are not "tainted fruits." Using this analysis, the majority quickly finds that "Howard's statements to Polk were not `involuntary' within the meaning of the Fifth Amendment,"**4** ante at 23-24, and concludes that the later confessions were not "tainted fruits."

The majority's approach misses the whole point of Edwards. The Edwards rule operates even absent a constitutional violation. See Roberson, 486 U.S. at 681-82. Thus, the majority's focus on just the voluntariness of Howard's statement to Polk is wholly misplaced. Edwards emphasizes that whether a confession is voluntary and whether a suspect has validly waived his already invoked right to counsel "are discrete inquiries." Edwards, 451 U.S. at 484. In Edwards, Robert Edwards asked for a lawyer the night of his arrest. The next morning two detectives came to the jail to see Edwards and advised him of his Miranda rights. They got a confession, and the state courts held it to be voluntary and admissible. The Supreme Court reversed on the admissibility point:

> We now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated interrogation even if he has been advised of his rights.

_____

**4** I repeat that Polk did not give Miranda warnings to Howard.

Id. (emphasis added). Thus, even though Edwards' confession was voluntary, it was inadmissible because he had not initiated the contact with the police. With respect to Howard, it makes no difference that the majority finds Howard's confession to Polk to be voluntary under traditional Fifth Amendment standards. Voluntariness is still the wrong inquiry. The only relevant question is whether Howard himself initiated communication with Polk, thereby waiving his previously invoked right to counsel.**5**

The whole problem with the majority's approach is that it never focuses on whether any of Howard's confessions -- the first to Polk and the second and third to Battle and Hitchins-- were made after a valid waiver of his once-asserted right to counsel. Instead, the majority holds that Edwards protection is broken with one "voluntary" (uncoerced) statement, made without Miranda warnings. The practical consequence of this holding is quite significant. Even though a jailed suspect has invoked his right to counsel, the police can now send in an interrogator who gets a confession (without counsel present) that is not coerced under traditional Fifth Amendment analysis. This allows the police to send in (still without counsel present) additional interrogators who get Miranda waivers and new, "untainted" confessions. The later confessions are admissible because the first was not coerced, even though all were obtained in blatant violation of Edwards.

I am convinced that the Supreme Court did not intend for the bright line rule of Edwards to be circumvented in this way. Indeed, the Supreme Court has indicated that fresh sets of Miranda warnings in subsequent police-initiated interrogation do not overcome the presumption that the suspect who has invoked his right to counsel believes he cannot cope with interrogation without his lawyer at his side. See Roberson, 468 U.S. at 686 ("[W]e . . . disagree with [the state's] contention that fresh sets of Miranda warnings will `reassure'

_____

**5** The majority's resurrection of the "voluntariness" question tramples on the simplicity of Edwards: "Edwards conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of Miranda in practical and straightforward terms." Minnick v. Mississippi, 498 U.S. 146, 151 (1990).

a suspect who has been denied the counsel he has clearly requested that his rights remain untrammeled."). There is only one conclusion: Miranda-warned confessions, such as those Howard gave to the FBI and the deputy sheriff, are inadmissible if they are set up by an earlier Edwards violation.

The majority's rationale for undermining Edwards appears to be based on a misapplication of Oregon v. Elstad, 470 U.S. 298 (1985), a case that is quite different from Edwards and Howard's case. In Elstad, when the police went to the home of the accused (Elstad) to arrest him, he admitted his involvement in the crime before he was given his Miranda rights. After Elstad was taken to the station, the police read him his rights; he then waived his right to counsel and gave a full confession. The Court noted that Elstad's prior unwarned statement, although inadmissible under Miranda, was not coerced. As a result, the first statement did not "compromise[ ] the voluntariness of [the] subsequent informed waiver," and the second statement was held admissible. Id. at 312. In direct contrast to the situation in Edwards, however, Elstad did not request counsel before making his first incriminating statement to the police. This distinction is critical. A defendant may give a statement to the police before receiving his Miranda warnings out of lack of awareness of his rights. In that case, "a careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible." Id. at 310-11. Any statement made after the Miranda warnings, therefore, is not tainted by the fact of a prior unwarned statement. But where the defendant requests counsel at the outset, the refusal to honor this request creates an atmosphere conducive to coercion, which the mere repetition of Miranda warnings cannot overcome. See Roberson, 486 U.S. at 686. That is why a request for counsel gives rise to a presumption of coercion that taints all future statements made outside the presence of counsel, unless the accused himself initiates later discussions with police.

Here the state maintains that Howard initiated the meeting with Polk, and there appears to be support for that argument in the record of state proceedings. Howard vehemently disagrees. In light of this, instead of rushing to scuttle Edwards, I would remand this case to the district court for it to determine who initiated the Howard-Polk meeting of October 3. If Howard initiated it, there is no Edwards violation.

45

In sum, the majority's premature move to obliterate the bright line rule of Edwards is contrary to clear precedent. The Supreme Court has repeatedly affirmed the principle set out in Edwards that once a defendant invokes his right to counsel, any later confession resulting from police-initiated interrogation must be suppressed. See, e.g., Smith v. Illinois, 469 U.S. 91 (1984) (per curiam) (reversing conviction because police continued to interrogate defendant after he invoked his right to counsel, even though his resulting confession was voluntary and not the product of coercion); Arizona v. Roberson, 486 U.S. 675 (1988) (reversing conviction where police initiated interrogation and obtained incriminating statements after defendant had invoked his right to counsel, even though questioning related to separate investigation); Minnick v. Mississippi, 498 U.S. 146 (1990) (reversing conviction where defendant was interrogated without a lawyer after he had invoked his right to counsel, even though his lawyer was "made available" outside interrogation room); Davis v. United States, 512 U.S. 452, 458 (1994) ("But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." (citing Edwards)). This unambiguous and continuing reaffirmance of the rule in Edwards means that unless Howard initiated the meeting with Polk, the resulting confessions Howard made to the FBI and the deputy sheriff were inadmissible. The Supreme Court has left no room for maneuver when it comes to Edwards.

The thrust of the majority's criticism of my dissent is that I "ignore[ ] . . . that Howard initiated the discussions with" the FBI. Ante at 24 n.17. In making this criticism, however, the majority ignores the full circumstances under which Howard "initiated" further contact with the authorities. According to the majority's reasoning, it is immaterial if Howard's "request" to talk with the FBI came in a statement (to Polk) obtained in violation of Edwards so long as the statement was "voluntary" in a constitutional sense. The majority's approach thus allows police to violate Edwards in one interrogation in order to get a waiver of Edwards for the next round of questioning. That approach is wrong, and it obliterates the clarity and protection of the bright line rule. The Edwards line of cases requires us to start with the suspect's request for counsel -- a constitutionally significant act -- and work forward from there. After the request for counsel is

46

made, there can be no interrogation unless the suspect initiates it without any prodding from the authorities. If Howard did not initiate the meeting with Polk, his entire statement to Polk, including his "request" to speak to the FBI, was obtained in violation of Edwards. The Edwards rule is meaningless if the police can use a request gotten in violation of Edwards to prove that a confession taken a few days later satisfies Edwards.

II.

Even if the confessions (to the FBI and the sheriff's deputy) were admissible, Howard should have been able to present the unredacted versions at his sentencing. The sentencing jury was given the following, incomplete story of Howard's confession: Howard held the plastic bag over Ms. Le's head to make her pass out but not to kill her. He then released the bag, believing that she had simply passed out and that she still had a pulse. He later realized as he and Weldon drove around that Ms. Le was dead. Howard admitted that he could not say who actually killed her.

There is a big gap in Howard's brutal story that the jury never heard. The jury was not told that when Howard released the bag, Weldon grabbed it, held it over Ms. Le's head, and reapplied pressure. Because of this omission, the sentencing jury was not allowed to hear Howard's assertion that Weldon likely committed the act that killed Ms. Le. Howard argues that the jury was required to consider whether this mitigated his own moral responsibility for the murder. Howard is correct that moral culpability is always relevant to sentencing: "Our capital cases have consistently recognized that`[f]or purposes of imposing the death penalty . . . [the defendant's] punishment must be tailored to his personal responsibility and moral guilt.'" South Carolina v. Gathers, 490 U.S. 805, 810 (1989) (quoting Edmund v. Florida, 458 U.S. 782, 801 (1982) (alteration in original)).[6]

_____

[6] Howard and Weldon were, of course, acting together. I therefore agree with the majority that Howard's statement about Weldon's final act does not change Howard's legal culpability for the murder under South Carolina law. In capital sentencing, however, the jury must make moral judgments that go beyond the question of legal responsibility.

47

The Eighth Amendment provides a capital defendant the broadest latitude to offer evidence at sentencing to avoid the death penalty. The general rule is that the jury must consider any mitigating evidence, that is, "any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion). The only question here, as the majority acknowledges, is whether any reasonable juror could have found the redacted portion of the confession to be mitigating. See ante at 32-33 (holding that "[w]e are firmly convinced that no reasonable juror could have found that the unredacted portions of Howard's confession were evidence that Weldon, rather than Howard, actually killed Le").

Howard's effort to offer his full confession is a perfect example of what the Supreme Court meant in Eddings v. Oklahoma, 455 U.S. 104 (1982), when it said that a capital defendant has the right to present at the sentencing phase all evidence about the "circumstances of the offense." The circumstances of the murder in this case are key. Of course, it is true that Howard did not have to be the "triggerman" to be eligible for the death penalty. See Tison v. Arizona, 481 U.S. 137 (1987). Eligibility, however, does not mean that capital punishment must be imposed. A jury can sentence a person to death in accordance with the Eighth Amendment only after it considers all of the mitigating evidence the defendant wishes to present. See Lockett, 436 U.S. at 608 (holding that defendant's relatively minor participation in the crime is a mitigating factor that sentencer must consider); Hitchcock v. Dugger, 481 U.S. 393 (1987) (Scalia, J.) (holding for a unanimous Court that sentencer in capital case must consider an extensive list of non-statutory mitigating factors). Howard must be allowed to present his side of the story.

The majority mistakenly assumes that the redacted evidence is only relevant to Howard's intent to kill. But it has a broader relevance for sentencing purposes: it sheds light on whether Howard or Weldon committed the ultimate act that caused Ms. Le's death. Indeed, even though Howard admitted he could not be sure who killed Ms. Le, a jury could find that Howard is less blameworthy from a moral standpoint than Weldon. This is because Weldon committed a conscious act to make sure Ms. Le would die. I readily concede that making a moral distinction here is extremely difficult. Is a murderer who

48

chokes a victim until she loses consciousness as culpable morally as one who chokes her after she is unconscious, just to make sure she is dead? What if he chokes the murder victim, but lets go when he thinks she is just unconscious? What if he restrains the victim while another chokes her to death? The law tells us who is legally responsible for the murder in each case. The law does not tell us whether the death penalty should be imposed in each case. It tells us only that the jury must have all the facts before making the sentencing decision.

A capital defendant is given broad latitude to offer mitigating evidence because "`the penalty of death is qualitatively different'" than any other sentence. See Lockett, 438 U.S. at 604 (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976)). The death penalty's irrevocable end has prompted the Supreme Court to require the sentencer in capital cases to consider a defendant's violent and troubled youth, see Eddings v. Oklahoma, 455 U.S. 104 (1982); good behavior in prison, see Skipper v. South Carolina, 476 U.S. at 1, 4-5 (1986); history of child abuse and emotional problems, see Penry v. Lynaugh, 492 U.S. 302 (1989); ineligibility for parole, see Simmons v. South Carolina, 512 U.S. 154, 162 (1994); poverty-ridden childhood, see Hitchcock, 481 U.S. at 397; good deeds as an affectionate uncle, see id.; and childhood habit of inhaling gas fumes, see id.

Thus, virtually no limits are placed on a capital defendant's ability to introduce mitigating evidence concerning his personal circumstances and the circumstances of his crime. See Eddings, 455 U.S. at 112. The majority makes this court the first to hold that when two or more are guilty of the same murder, evidence about the identity of the actual killer is not relevant in mitigation at the sentencing phase. This position is particularly questionable in light of the Supreme Court's holding in Green v. Georgia, 442 U.S. 95 (1979) (per curiam). In that case the trial court refused to admit a statement by a third party that Green's partner in an abduction had murdered the victim outside of Green's presence. The Supreme Court reversed Green's capital sentence because "the excluded testimony was highly relevant to a critical issue in the punishment phase of a trial," namely whether Green participated directly in the murder. Id. at 97 (citing Lockett); see also Chaney v. Brown, 730 F.2d 1334, 1357 (10th Cir. 1984) (upholding conviction but vacating death sentence because "[t]he withheld reports contained important mitigating evidence supporting the infer-

49

ence that another person or persons were involved in the kidnappings and murders, and that [the defendant] may not have personally killed the victims").

One theme underlies the Lockett and Eddings line of cases: the sentencing jury alone, armed with the complete story, must decide the question of the capital defendant's moral culpability. Yet here the majority steps into the jury box, reviews the unredacted statements, and decides the question of moral culpability against Howard. See ante at 33 ("Nothing in the redactions altered Howard's personal culpability for Le's death. Moreover, nothing in the redactions could be construed as mitigating evidence in Howard's favor."). The majority's judgment is based on three determinations that must be left for a jury. First, the majority indicates that the omitted assertion (Weldon likely killed the victim) is negated by the rest of what Howard said. But the state introduced most of what Howard said for its truth, suggesting that he was not completely unreliable. Compare Green, 442 U.S. at 97 (noting that prosecution had introduced Green's confession in guilt phase). It is the jury, and not this court, who should decide whether the rest of what Howard said is reliable. Second, the majority notes that the unredacted confessions reveal Howard's own uncertainty about "whether he or Weldon committed the final act of murder." Ante at 33. It is true that Howard could not be sure that he removed the plastic bag in time. But a jury could decide that this uncertainty makes him less culpable than Weldon, who was a calculated and deliberate killer. Third, the majority suggests that the redacted portion simply inculpates Weldon instead of helping Howard. In this case, however, anything that makes Weldon look worse necessarily helps Howard because relative blameworthiness could be important to the jury in deciding whether to sentence one or both to death. Indeed, relative blameworthiness was important to one of the jurors on the panel that voted to sentence Howard to death. This juror was asked in voir dire about a murder case she was familiar with where three defendants were convicted of murder but only one was given the death penalty:

> Q. And what did you feel about Pierce's sentence?
>
> A. Well, I understand he was the only one that they decided killed her, and the other two also participated

50

in the crime, but I understood the reason that he was sentenced to death was because he took the initiative to kill.

Q. All right. And what was your feeling about Pierce's sentence?

A. Well, like I said, I was not in the courtroom. I didn't hear all the -- I read the paper, I kept up with it through friends, and I'm sure that the -- I mean I trusted the jury's decision.

Q. Did you have any question that they all should have gotten the death penalty or none should have gotten the death penalty?

A. I wasn't surprised that the other two didn't get the death penalty. I can understand how they decided that.

Q. Why weren't you surprised?

A. Because Pierce was the one who killed her.

J.A. 368-69. This voir dire reveals that, if given a fully informed choice, a jury could choose to execute only the most morally culpable among a group of murderers. Howard's jury was prevented from making that informed choice.**7**

_____

**7** The majority also claims that excluding these statements was merely harmless error. The difficulty of reconstructing the moral decision that capital sentencing demands suggests, at a minimum, that in order to be deemed harmless, the evidence must be irrelevant or trivial. In Hitchcock the unanimous Supreme Court held that the prosecution has the burden to prove that the defendant was not prejudiced by the exclusion of mitigating evidence. See Hitchcock, 481 U.S. at 397; see also O'Neal v. McAninch, 513 U.S. 432 (1995). The state has not even attempted to meet that burden here. In any event, the voir dire demonstrates that we cannot say with any confidence that the jury would have come back with the same verdict of death if it had heard the full confession. When a court is "in grave doubt about whether a trial error of federal law had a `sub-

51

The jury sentenced Howard to death without hearing his whole story to the authorities about the circumstances of the crime. The jury never knew that he claimed it was Weldon who likely committed the ultimate act of murder. Howard should not be put to death unless a jury rejects the mitigating evidence that was barred from his sentencing.

III.

In sum, I respectfully dissent for two reasons. First, the majority ignores Edwards and holds that it is immaterial whether Howard (who had invoked his right to counsel) initiated the contact with authorities that led to his confessions. Second, the majority ignores the Eighth Amendment and cases such as Lockett and Eddings when it usurps the jury's role and decides that it was not mitigating when Howard said that Weldon took the final step to kill the victim. A jury must hear that statement before it decides whether Howard should die.

Judges Hall, Murnaghan, and Motz join in this dissent.

_____

stantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." O'Neal, 513 U.S. at 436. Sufficient doubt is created here because the voir dire reveals that at least one juror might consider evidence that Howard did not actually kill the victim to be mitigating.

52