UNPUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

LANCE ANTONIO CHANDLER, JR.,
Petitioner-Appellant,

v.

No. 97-27

FRED W. GREENE, Warden,
Mecklenburg Correctional Center,
Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, Chief District Judge.
(CA-96-966-R)

Argued: March 5, 1998

Decided: May 20, 1998

Before WILKINSON, Chief Judge, and WIDENER and
NIEMEYER, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Niemeyer wrote the opinion,
in which Chief Judge Wilkinson and Judge Widener joined.

_____

**COUNSEL**

**ARGUED:** Barbara Lynn Hartung, Richmond, Virginia, for Appel-
lant. Katherine P. Baldwin, Assistant Attorney General, OFFICE OF
THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.
**ON BRIEF:** Anthony F. Anderson, Melissa W. Freidman, Roanoke,
Virginia, for Appellant. Mark L. Earley, Attorney General of Vir-

ginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

NIEMEYER, Circuit Judge:

Petitioner Lance Antonio Chandler, Jr., shot and killed William Howard Dix during the robbery of a convenience store in Halifax County, Virginia, on February 7, 1993. Chandler was tried before a jury in Virginia state court and convicted of capital murder and related offenses. On the jury's recommendation, the court sentenced him to death. After exhausting his direct state appeals and unsuccessfully petitioning the Supreme Court for a writ of certiorari, Chandler sought post-conviction relief from the Virginia Supreme Court. When that relief was denied, he filed this petition for a writ of habeas corpus in the district court. From the district court's denial of his petition, Chandler has appealed, contending that the district court erred (1) in denying his claim that the state prosecutor peremptorily struck three black jurors in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), and (2) in denying his claim for ineffective assistance of counsel during the sentencing phase of his trial. For the reasons that follow, we affirm.

I

During the evening of February 7, 1993, Lance Chandler, Geraldine Fernandez, Dwight Wyatt, and George Boyd discussed robbing a local convenience store called Mother Hubbard's. Chandler told the three others that the store clerk, William Dix, was "a little bit slow" and would not give them any trouble. Chandler also said that they could get a gun from his half-brother, Henry Chappell. Chandler had previously given a fully-loaded revolver to Chappell to hide for him.

2

The four conspirators, together with Bernice Murphy, Chandler's girl-friend, drove to Chappell's house in South Boston, Virginia, and obtained the gun from Chappell. Wyatt inspected the gun and saw that it was loaded, and Chandler also checked the gun. As the group drove to Mother Hubbard's convenience store, Wyatt handed Chandler the gun.

When the group arrived at Mother Hubbard's, Chandler, Wyatt, and Boyd went into the store. Boyd and Wyatt headed to the back of the store to steal beer, while Chandler approached Dix and demanded money. When Dix did not respond, Chandler pointed the gun at Dix, closed his eyes, and pulled the trigger as he said"boom." The gun did not fire, and Chandler pulled the trigger a second time, shooting Dix in the face. The bullet passed through Dix's mouth into his neck, bruising his spinal cord and paralyzing the muscles that controlled his breathing. Dix later died. Chandler, Wyatt, and Boyd then ran from the store carrying a case of beer. When the five individuals were later questioned by Halifax County authorities, Chandler admitted to shooting Dix.

A Halifax County grand jury indicted Chandler on one count of capital murder, one count of robbery, one count of conspiracy to com-mit robbery, and two counts of using a firearm during the commission of a felony. At trial, during jury selection, Chandler's attorney objected to the prosecutor's use of three out of five peremptory chal-lenges to remove three black jurors from the jury, but the trial judge found that the prosecutor's explanation for striking the three black jurors was "race neutral" and overruled Chandler's objection.

Several of Chandler's companions on the date of the murder testi-fied at trial for the prosecution. Wyatt testified that, after the three men left the store, Chandler remarked that the money did not belong to Dix, and both Fernandez and Murphy testified that, when they were in the car driving away from the crime scene, Chandler said, "the man was protecting money that wasn't his," and "why didn't that man open the register?" Fernandez also testified that Chandler said that he had always wanted to know what it was like to kill a man and that he was going to put a hole in the shell casing and wear it around his neck as a souvenir.

3

Chandler, testifying in his own defense, admitted that he shot Dix. He maintained, however, that the killing was not premeditated and that he never intended to kill Dix. He claimed that he was under the influence of drugs and alcohol when he shot Dix and that he did not believe the gun would fire live bullets. Chandler explained that when he received the gun, he looked inside its cylinder and saw what he thought were three empty shell casings and one live bullet. Chandler stated that he thought he could pull the trigger at least four times before the gun would fire a live round and that he did not expect the gun to fire when he pulled the trigger the second time. He admitted, however, that the gun had been fully-loaded when he gave it to Chappell five days earlier. Chandler testified that he did not have "the slightest idea" why he pulled the trigger while pointing the gun at Dix and insisted that he did not intend to shoot or kill Dix. Several witnesses corroborated Chandler's testimony that he had been using drugs and alcohol the night of the murder.

The jury found Chandler guilty on all counts, and the court commenced the penalty phase of the trial before the same jury. During the penalty phase, the Commonwealth sought the death penalty based on both Chandler's future dangerousness and the vileness of his crime. The prosecution introduced evidence of Chandler's prior criminal record, which included a conviction for disorderly conduct at age fourteen, a conviction for breaking and entering at age sixteen, and a conviction for assault and battery at age eighteen. In addition, when Chandler was nineteen, he was convicted of disorderly conduct, public drunkenness, cursing and abusing a police officer, and failing to appear in court. He also was convicted of robbery and use of a firearm during the commission of a felony in connection with a holdup of a UPS delivery driver less than six months before he murdered Dix. The prosecution also presented evidence that Chandler had dropped out of school in the 9th grade, had little record of employment, and had no active involvement in any religion. Fernandez testified again, repeating her previous testimony that, following the murder, she twice heard Chandler state that he planned to wear the empty shell around his neck as a souvenir. She further testified that Chandler had warned her and the others on the Monday after the murder that if they went to the police, they would not "live to see Court date."

Chandler chose not to present any evidence or call any witnesses during the penalty phase. He also chose to waive closing argument.

4

Chandler's attorney explained to the judge that he and Chandler had "discussed this and its implications and possible effect at rather great length. I'm actually satisfied that he understands fully. He's an intelligent young man and I'm satisfied that he knows what he's doing." Chandler agreed with his attorney's statements. The trial court then closely questioned Chandler as follows:

> Q. Mr. Chandler, of course, the fact that you have no evidence to present on the question of mitigation, the fact that you do not desire to present any evidence in mitigation is something that is of concern to the Court. You have that right, you understand?
>
> A. Yes.
>
> Q. You have the right to present any evidence that might be relevant to that, to any issue in the penalty stage of the proceedings. That has been explained to you thoroughly by your attorney, Mr. Ward, is that correct?
>
> A. Yes.
>
> Q. And are you completely satisfied with his representation of you?
>
> A. Yes.
>
> Q. You understand that you have the right to present evidence at this particular stage of the proceedings in the penalty stage?
>
> A. Yes.
>
> Q. And you've discussed this with your attorney?
>
> A. Yes.
>
> Q. And you have elected not to present any evidence at this stage?

5

A. Yes.

Q. Now, you also understand, too, that you have the right to present final argument to the jury. Ordinarily that argument will be presented by your attorney; in this case Mr. Ward or Ms. Miller. Are you asking that they not present any final argument to the jury?

A. Yes.

Q. This is your choice?

A. Yes.

Q. You realize that this is your opportunity to present argument to the jury that the jury consider an option other than the death penalty; in other words consider life imprisonment?

A. Yes.

Q. You understand that?

A. Um-hum.

Q. And Mr. Ward is here as your attorney to assist you in that regard. Do you understand that?

A. Yes.

Q. And he has expressed a willingness, I assume, at all times to represent you at every stage of the proceeding, is that correct?

A. Yes.

Q. And you are now at this point in the proceeding asking that he not present final argument to the jury on this extremely important issue, a matter of life and death?

6

A. Yes.

Q. Have you thoroughly discussed this with him?

A. Yes.

Q. And you're absolutely certain that this is what you want to do?

A. Yes.

Q. Mr. Chandler, I would encourage you to consider presenting a final argument to the jury. I would encourage you to present any evidence that you might have which might bear on the issue of mitigation. This is your opportunity to do so. And we, of course, are now going to, since you have rested the case, your attorney has rested the case, we are now going to discuss the matter of instructions that will be given to the jury. So, it will be some time between now and the time you will be given an opportunity to present final argument to the jury. You can change your mind at any time. You will be given that opportunity, and if you want Mr. Ward to present a final argument to the jury, you can certainly have him do so at the appropriate time. And I would urge you to do that. I can't express too strongly how much I urge you to have Mr. Ward give a final argument and also present any evidence that you might have in your behalf at this stage of the proceeding. Do you understand everything that the Court has asked you?

A. Yes.

After the judge discussed the sentencing instructions with the attorneys, he resumed his questioning of Chandler:

The Court: . . . I want to underscore again to Mr. Chandler that he has the right to make a final argument to the jury through his attorney, or he has the right to do so personally. But the Court will encourage him to have his attorney

7

address the jury on this extremely important issue. As I have indicated, it is a matter of life and death. And I can't stress too strongly to Mr. Chandler -- Are you listening to me, Mr. Chandler?

Chandler: Yes.

The Court: I can't stress too strongly how important it is for you to allow your attorney to represent you to the fullest. By not allowing him to do so you are giving up a very important right that you have. Do you understand that?

Chandler: Yes.

After the court gave the jury its instructions, to which no objection was made, the jury found that Chandler constituted a continuing threat to society and recommended a sentence of death.

Following the conclusion of the jury trial and prior to final sentencing by the court, Chandler decided to offer evidence in mitigation of his sentence. At the sentencing hearing before the court, both Chandler and his minister testified. Chandler told the court that he did not intend to kill Dix during the robbery and that he had nightmares and hallucinations involving Dix, providing proof, he argued, that he never intended to kill Dix. Chandler told the court that he was taking medication to help him sleep. Chandler also testified that he had not seen his father for several years, and that his mother had recently died of cancer. Chandler's minister testified that he had known Chandler since Chandler was in grade school and that at one point he had chosen Chandler to train him as a deacon, but that Chandler had not attended church in about four years.

Other evidence before the court at the sentencing hearing included a post-sentence report, which contained a victim impact statement and the testimony of Deputy Sheriff Keith Tribble. Tribble testified that, following Chandler's conviction and jury sentencing, Chandler told him that "had he known that he was going to get the chair for [killing Dix], he would probably have shot him more than once" and that "if he really wanted to kill somebody, he would do it slowly so they

8

would suffer." Chandler admitted making this last statement. Tribble also testified that Chandler said that "he was now being portrayed as the baddest man in Halifax County, so he needed to act as such."

In determining whether the jury's sentence of death should be set aside, the court found that Dix's murder was willful and premeditated; that Chandler's criminal record "suggests a life of increasingly violent crimes"; and that Chandler's statement that he planned to wear the empty shell from the murder around his neck as a souvenir "showed an utter lack of remorse." The court also found that Chandler had presented "little or no evidence of a mitigating nature." Finding nothing, therefore, "which would justify disturbing the penalty which has been recommended by the jury," the court concluded that the death sentence was "appropriate and just." Accordingly, on April 8, 1994, the trial court sentenced Chandler to death.

Chandler appealed to the Virginia Supreme Court, which affirmed his conviction and sentence. Chandler v. Commonwealth, 455 S.E.2d 219 (Va. 1995), and the Supreme Court denied his petition for a writ of certiorari on October 2, 1995. Chandler then filed a state petition for a writ of habeas corpus in the Virginia Supreme Court, and that court ultimately dismissed the petition on August 5, 1996. The Circuit Court of Halifax County then scheduled Chandler's execution for November 14, 1996. One week before the execution date, the district court entered an order staying execution. Chandler filed his federal petition for a writ of habeas corpus on February 10, 1997, and the district court denied it in its entirety on August 4, 1997. This appeal followed.

II

Chandler contends first that the district court erred in denying his claim that his rights under the Equal Protection Clause of the Fourteenth Amendment were violated when the state prosecutor used three out of five peremptory challenges to remove three black jurors from the jury. Chandler argues that the prosecutor's reasons for the strikes, when examined in light of the entire record, were mere pretexts for unlawful racial discrimination.[1]

_____

[1] The Commonwealth contends that Chandler has defaulted and/or waived his claim that the prosecutor's reason for striking juror Robert

9

In Batson v. Kentucky, 476 U.S. 79, 89 (1986), the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Where the prosecutor's pattern of strikes against black jurors reasonably gives rise to an inference of discrimination, the prosecutor must articulate a race-neutral explanation for the challenges. See id. at 97; Howard v. Moore, 131 F.3d 399, 407 (4th Cir. 1997) (en banc). The prosecutor's explanation "need not be `persuasive, or even plausible,' as long as it is neutral." Matthews v. Evatt, 105 F.3d 907, 917 (4th Cir. 1997) (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curiam)). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Purkett, 514 U.S. at 768 (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991) (plurality opinion)). The trial court then must determine whether the challenges were exercised for a racially discriminatory reason. Howard, 131 F.3d at 407. This is a factual determination, Hernandez, 500 U.S. at 364, which in a habeas proceeding is presumed to be correct. See 28 U.S.C. § 2254(e)(1) (1996).**2** Consequently, in order to prevail on his Batson claim, Chandler must show by clear and convincing evidence that the trial court erred in finding that the prosecutor's explanation for the three strikes was "race neutral." Id.

During the Batson hearing, the state prosecutor, who denied striking any juror because of race, explained that he struck jurors William Yarborough and Annie Ewell primarily due to their opposition to the death penalty. During voir dire, both jurors consistently indicated that they were opposed to capital punishment and would be extremely reluctant to vote for the death penalty. For example, when asked by the court whether he had "any opinion which would prevent you from convicting anyone of an offense which might be punishable with

_____

Williams was pretextual. Since we conclude that Chandler's claim fails on the merits, we find it unnecessary to address the state's argument on this issue.

**2** Since Chandler filed his federal habeas petition after the Anti-Terrorism and Effective Death Penalty Act of 1996 went into effect, the amended provisions of 28 U.S.C. § 2254 apply to these proceedings. See Lindh v. Murphy, 117 S. Ct. 2059, 2068 (1997).

10

death," Yarborough replied, "I don't believe in capital punishment." Later, the prosecutor asked Yarborough, "do you have moral objections to the death penalty?" Yarborough answered,"Well, I'm for life, you know. I don't like to kill nobody. . . . I wouldn't like to be the one that was the cause of someone to die." The prosecutor then asked him whether "you can still vote for the death penalty," to which Yarborough replied, "Well, what I'm trying to get you to see is I don't believe in killing, but if there's a war and I had to fight, I guess I would."

Ewell's comments were very similar to Yarborough's. For example, when the prosecutor asked the jury panel whether "any of you have any feelings of conscious [sic] or religion or general moral scruples that would prevent you from -- realistically prevent you from considering the death penalty as a punishment," Ewell smiled and replied, "I don't think I could." The prosecutor then asked her individually, "Do you not believe in the death penalty," to which Ewell replied, "I do not." The next question the prosecutor asked Ewell was, "Do you think you would have difficulty in considering the death penalty as an option in any case?" Ewell answered,"In any case? No, I don't, but I just don't believe in the death penalty. I just don't believe in it."

The trial court found that the prosecutor's reasons for striking Yarborough and Ewell were not racially discriminatory. Based on our review of the record, we cannot find, by clear and convincing evidence, that the court erred.

Chandler argues, however, that black jurors are more likely than white jurors to oppose the death penalty and, therefore, that "prosecutors who use anti-death penalty views as a `race-neutral' reason [for striking black jurors] undermine the purposes behind the Batson ruling." While we can find no evidence in the record concerning the relative propensities of black and white jurors to oppose capital punishment, we reiterate that under Supreme Court precedent the prosecutor's explanation for striking black jurors"will be deemed race neutral" unless "a discriminatory intent is inherent" in the explanation. Purkett, 514 U.S. at 768 (emphasis added). Since our decision in Brown v. Dixon, 891 F.2d 490, 496-98 (4th Cir. 1989), makes clear that peremptorily striking jurors on the basis of their opposition to

11

capital punishment does not violate Batson, we conclude that Chandler has failed to show by clear and convincing evidence that the trial court's determination that the prosecutor struck Yarborough and Ewell for "race neutral" reasons was erroneous.

On Chandler's challenge to the prosecutor's reason for striking juror Robert Williams, the record shows that the prosecutor struck Williams because he had been "remarkably noncommunicative" during voir dire. Chandler argues, however, that "[t]he record demonstrates that Williams' responsiveness or communicativeness did not differ from that of other jurors." We must acknowledge that assessments of this type are highly subjective. But nevertheless, unless discriminatory intent is shown, "a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case." Batson, 476 U.S. at 89 (internal quotation marks and citation omitted). Moreover, as we explained in Matthews, supra, "Batson is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not. This is so because counsel must be entitled to make credibility determinations in exercising peremptory challenges." 105 F.3d at 918 (citation omitted); see also Howard, 131 F.3d at 408.

We emphasize that the question is not whether the prosecutor's reason was a good one or even whether it was based on accurate information. Rather, the crucial inquiry is whether the prosecutor struck the juror for racially discriminatory reasons. See United States v. Chandler, 36 F.3d 358, 366-67 (4th Cir. 1994) (affirming peremptory challenge of black juror where nothing in record established that prosecutor did not believe factually mistaken explanation he gave for striking juror). Thus, even assuming that the prosecutor's reasons for striking Williams were factually mistaken, Chandler simply has offered no evidence that the prosecutor's peremptory challenge of Williams was racially motivated. Consequently, Chandler has failed to overcome the presumption of correctness that attaches to the trial court's findings under 28 U.S.C. § 2254(e)(1).

III

Chandler's second argument on appeal is that the district court erred in denying his claim that his attorney's assistance during the

12

sentencing phase of his trial was ineffective under Strickland v. Washington, 466 U.S. 668 (1984). Specifically, Chandler contends that his trial counsel was ineffective for (1) failing to investigate and present mitigating evidence during the sentencing phase of his trial, (2) failing to request an instruction explaining the concept of mitigating evidence to the jury, and (3) failing to object to the trial court's refusal to inform the jury that, if given a life sentence, Chandler would not be eligible for parole for twenty-five years.

Under Strickland's familiar test for reviewing claims of ineffective assistance of counsel, Chandler must demonstrate both that his trial counsel's representation was deficient and that he was prejudiced thereby. See Strickland, 466 U.S. at 687; Howard, 131 F.3d at 421. An attorney's representation is deficient if it falls below an objectively reasonable standard of professional competence. See Strickland, 466 U.S. at 690. In making this determination, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Even where an attorney's representation is deficient, however, no constitutional violation occurs unless the attorney's representation also is prejudicial. See Strickland, 466 U.S. at 691-92. In order to demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In the context of Chandler's challenge to his death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695. With these guiding principles in hand, we turn to Chandler's specific assignments of error.

Chandler first argues that his trial counsel was ineffective for "not conduct[ing] any mitigation investigation in preparation for the sentencing phase of this capital trial." As a result, Chandler contends, his initial decision to forego a defense at the sentencing hearing "was not a knowing waiver." The district court rejected this argument, finding that "Chandler's decision not to challenge the death penalty was a knowing and voluntary decision."

13

In order to comply with the competency requirements set forth in Strickland, an attorney representing a capital defendant must make a reasonable investigation for possible mitigating evidence. See Matthews, 105 F.3d at 919. As the Supreme Court qualified that principle, however, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691. Here, it is undisputed that both before trial and during trial Chandler directed his attorney not to present evidence or argument to the jury in mitigation of his sentence. Furthermore, nothing in the record indicates that Chandler's decision in this regard was the product of "a mental disease, disorder, or defect" which substantially affected his capacity "to appreciate his position and make a rational choice" with respect to the sentencing hearing. See Rees v. Peyton, 384 U.S. 312, 312 (1966) (per curiam). While it is true that Chandler had a history of alcohol and drug abuse and was diagnosed with "depressive disorder" following an alleged suicide attempt prior to trial, he also was found competent to stand trial and impressed his attorney as "an intelligent young man" who "knows what he is doing." Moreover, during the careful, lengthy questioning by the court, Chandler acknowledged that he understood that he had the right to present evidence and argument to the sentencing jury, that he had discussed his decision not to do so with his attorney, and that he was satisfied with his attorney's representation. Under these circumstances, we agree with the district court that Chandler's trial counsel was not constitutionally ineffective for following his client's informed decision not to present evidence or argument to the sentencing jury.

Chandler also argues that, following his decision not to present mitigation evidence to the jury and his change of mind after the jury trial to present mitigation evidence and argument to the court before final sentencing, his counsel was ineffective in failing to "present mitigation evidence that was readily available after a reasonable investigation." The district court did not address this argument because it was raised for the first time in this appeal.[3] In any event, the claim

_____

[3] The Commonwealth contends that Chandler has defaulted and/or waived this claim. Since we conclude on the merits that Chandler's counsel's performance at this proceeding was neither deficient nor prejudicial under Strickland, we find it unnecessary to address the state's procedural argument.

14

has no merit. At the sentencing hearing before the court, Chandler's attorney presented the testimony of both Chandler and his minister, as well as his own argument, in mitigation of Chandler's sentence. Other potentially mitigating information was contained in the post-sentence report submitted to the court by Chandler's probation and parole officer. From these various sources, an accurate representation of Chandler's life story was made.

The court heard how Chandler was the seventh of eight children raised by his single mother on welfare. Chandler's mother died shortly before trial, and he had a troubled relationship with his father who lived out of state and whom Chandler had not seen for several years. Chandler had a poor academic record in school and dropped out in the ninth grade. He also had a long history of alcohol and drug abuse and had been using both on the night of the murder. At least three members of Chandler's family had criminal records. As a child, Chandler had been chosen by his minister to train as a deacon, but Chandler had not attended church for a number of years. Following his arrest, Chandler experienced hallucinations and nightmares concerning the murder and was prescribed medication to help him sleep.

In his argument to the court, Chandler's attorney repeated much of this information, but he emphasized most that Chandler was not sufficiently dangerous to society to warrant receiving the death penalty. He argued that Chandler's criminal record was minor in comparison to those of numerous other defendants who had received the death penalty, and he emphasized Chandler's claim that the weapon Chandler had used during his holdup of the UPS delivery driver was a BB gun. Finally, Chandler's attorney explained to the court that Chandler felt remorse for the murder and pleaded for the court's mercy.

This performance was not ineffective. The most salient facts concerning Chandler's background, the circumstances of the murder, and Chandler's state of mind were fully presented to the court, and Chandler's attorney's argument concerning Chandler's lack of future dangerousness demonstrated extensive knowledge and preparation. Moreover, Chandler has identified very little additional information which his attorney could have presented to the court. Accordingly, we conclude that Chandler has failed to rebut the presumption under

15

Strickland that his trial counsel's performance fell "within the wide range of reasonable professional assistance." See 466 U.S. at 689.

Chandler next argues that his trial counsel was ineffective for "fail-[ing] to proffer an instruction that adequately explained mitigation and that informed the jurors that they were not required to impose the death penalty even if an aggravating circumstance were found." The Commonwealth contends that Chandler's argument is foreclosed by the Supreme Court's recent decision in Buchanan v. Angelone, 118 S. Ct. 757, 762 (1998), in which the Court upheld the constitutionality of a Virginia capital sentencing instruction substantially identical to the one that the court gave in this case. See 118 S. Ct. at 759 n.1.

First, we agree that in light of the Court's ruling in Buchanan, Chandler's trial counsel was not constitutionally ineffective for failing to proffer a substitute instruction. Moreover, there was no basis for Chandler's attorney to challenge the trial court's sentencing instruc-tion in this case, since the instruction adequately explained the appli-cable law to the jury. Furthermore, the trial court's instruction "did not foreclose the jury's consideration of any mitigating evidence." See Buchanan, 118 S. Ct. at 762. Indeed, the verdict form invited the jury to consider "evidence in mitigation of the offense." Consequently, neither can it be said that Chandler's attorney's failure to provide an alternate instruction was prejudicial under Strickland. As the Supreme Court explained in Buchanan:

> By directing the jury to base its decision on "all the evi-dence," the instruction afforded jurors an opportunity to consider mitigating evidence. The instruction informed the jurors that if they found the aggravating factor proved beyond a reasonable doubt then they "may fix" the penalty at death, but directed that if they believed that all the evi-dence justified a lesser sentence then they "shall" impose a life sentence. The jury was thus allowed to impose a life sentence even if it found the aggravating factor proved.

Id. See also Jones v. Murray, 947 F.2d 1106, 1119-20 (4th Cir. 1991) (holding that Virginia capital sentencing instruction and jury verdict form adequately instructed jury to consider all relevant mitigating evi-dence before imposing death sentence).

16

Finally, Chandler claims that his trial counsel should have objected to the trial court's refusal to inform the jury that, if given a life sentence, Chandler would not be eligible for parole for twenty-five years. Shortly after the jury began deliberating, the jury informed the judge that it had a question. The foreman indicated that the jury wanted to know if Chandler "is ever allowed parole" if he received a life sentence. The judge responded by giving the following instruction: "You have found the defendant guilty. And you should impose such punishment as you feel is just under the evidence and within the instructions of the Court. You are not to concern yourselves with what may happen afterwards." Chandler's attorney did not object to the judge's refusal to inform the jury that Chandler would be eligible for parole after serving twenty-five years of a life sentence. Reviewing these facts, the district court found that Chandler's attorney's failure to object did not prejudice Chandler since "Chandler had no right under either the Constitution or Virginia law to inform the jury that he would not be eligible for parole for twenty-five years if sentenced to life." We agree. This is not analogous to the facts in <u>Simmons v. South Carolina</u>, 512 U.S. 154, 162 (1994), where the Supreme Court held that a state deprives a defendant in a capital case of due process if it "conceal[s] from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment mean[s] life without parole." Since under Virginia law a life sentence does <u>not</u> mean life without parole, <u>Simmons</u> offers no support for Chandler's claim. In the absence of a constitutional or statutory right to inform the jury as to the date of his parole eligibility which his trial counsel overlooked, we cannot find that Chandler has demonstrated his attorney's ineffectiveness under <u>Strickland</u>. **4**

_____

**4** Chandler also argued in his federal habeas petition that his constitutional rights were violated by the trial court's failure to instruct the sentencing jury with respect to mitigating circumstances and by its refusal to inform the jury concerning Chandler's ineligibility for parole for twenty-five years if sentenced to life. The district court found that these two claims had been procedurally defaulted. On appeal, Chandler contends that his trial counsel's ineffectiveness provided cause for these procedural defaults. Since we conclude that Chandler's trial counsel was not constitutionally ineffective, we affirm the district court's dismissal of these two claims.

17

IV

For the foregoing reasons, the district court's decision denying Chandler's federal petition for a writ of habeas corpus is

AFFIRMED.

18